139 So.2d 770 (1961)
Elizabeth A. RUSSELL
v.
Mrs. Mary DART, Wife of and Walter M. BARTLETT.
No. 21195.
Court of Appeal of Louisiana, Fourth Circuit.
April 24, 1961.
*771 Lemle & Kelleher, Harry B. Kelleher and Albert L. Dart, New Orleans, for Mr. and Mrs. Walter M. Bartlett, defendants and appellants.
Gertler, Hart & Duran, Melvin J. Duran, New Orleans, for third-party defendants and appellants.
*772 Adams & Reese and John T. Cooper, New Orleans, for plaintiff and appellee.
Before JANVIER, McBRIDE and SAMUEL, JJ.
McBRIDE, Judge.
This is an action quanti minoris. On July 20, 1955, plaintiff, Mrs. Elizabeth A. Russell, purchased from Mr. and Mrs. Bartlett the property on which is located the dwelling, more than 50 years old, bearing Municipal No. 3020 Prytania Street, by means of a sale and resale, through a local building and loan association. The purchase price, $33,000, was $2,000 over and above the amount the Bartletts had paid for the property. During negotiations which led up to the sale, Mr. Bartlett explained to Mrs. Russell that the $2,000 increase was meant to cover his expenses in connection with his acquisition of the property plus the cost ($1,270) of a new roof which he had installed on the building in March 1955, Bilbe Sheet Metal Works being his contractor.
Exactly a year from the date of the sale, to-wit, July 20, 1956, Mrs. Russell instituted this suit against Mr. and Mrs. Bartlett seeking a reduction of the purchase price to the extent of $1,225, which amount she alleges would be the cost necessary for the installation of a new roof. She avers that the roof presently on the building is defective in several enumerated respects and that said defects existed at the time of her purchase of the property, that they were not apparent nor discoverable by simple inspection, and they seriously affect the use of and the purpose for which she purchased the property. Several defenses are made, each of which will be hereinafter discussed.
Defendants impleaded Bilbe Sheet Metal Works, a copartnership as third-party defendant, and prayed that in the event plaintiff recovered judgment against them that they in turn have judgment in like amount against said third-party defendant and its component partners, it being alleged said contractor represented that his job had been performed in a workmanlike manner and that there were no vices in construction.
The pith of the defense of Bilbe Sheet Metal Works is a denial that defects exist in the roof and the affirmative assertion that the contract had been completed in a satisfactory and workmanlike fashion.
The record contains nearly 500 pages of transcribed testimony adduced at the lengthy trial, as well as numerous photographs and other exhibits. Before deciding the case, the judge visited the premises and made visual observation of the roof. Judgment was rendered in favor of plaintiff as prayed for and defendants recovered like judgment against Bilbe Sheet Metal Works and its partners. The matter reaches us on the appeals perfected by defendants and their third-party defendants.
We find that the defendants represented the roof to be new and satisfactory and made no secret of the fact that they included the cost thereof in the price they demanded for the property. Nor are we doubtful of the fact that Mrs. Russell would not have bought the property for $33,000 had she known the roof was in a defective condition. A house with a defective roof undoubtedly fails to serve the purpose for which it is acquired. Di Pietro v. Le Blanc, La.App., 68 So.2d 156.
To support his denial that the roof was defective, Mr. Bartlett testified that before he paid Bilbe Sheet Metal Works he made an examination of the roof from a scuttle and that Bilbe's job appeared to be satisfactory in all respects.
Plaintiff produced two expert witnesses skilled and experienced in the roofing trade and the defendants and the third-party defendants produced a total of four experts (one of these being an employee of Bilbe Sheet Metal Works who had worked on the job), all for the purpose of demonstrating *773 to the court the respective versions as to the condition of the roof.
The composite gist of plaintiff's expert testimony is that Bilbe's job was poorly executed in that the workmanship was unsatisfactory and the asbestos shingles improperly applied. They pointed out defects, such as, shingles not having been laid in straight lines, insufficient overlaps, and the nails affixing the shingles to the sheeting not having been driven deep enough. The metal flashing also came in for criticism. One witness declared the two valley pipes he examined had stripped out and no nail holes therein were apparent.
All experts who testified in the case agreed on one thing and that is that many shingles were missing and that from 400 to 500 were cracked. One of plaintiff's experts attributed the cracking to inferior workmanship, but the other gave no opinion as to how the cracking might have been occasioned. Both plaintiff experts said that because of poor workmanship the roof was certain to leak, but a leaky condition might not immediately become manifest because of the layer of felt under the shingles which would have the effect of retarding the time of the leaks.
Plaintiff's experts also gave their opinions as to what steps should be taken to remedy the situation. One recommended the complete removal and replacement of the present shingles on the front half of the building and replacement of the cracked shingles in the rear, with new metal work, as required. He estimated the cost for this work to be $1,225, which he said would be the same cost the installation of an entire new roof would entail. The other plaintiff witness said repairs would not suffice and a new roof which would cost $1,250 was imperative.
On the other hand, the four experts for the other parties held divergent opinions. Their testimony is that a new roof is unnecessary and all claim the roof is susceptible to being repaired, their estimations of the cost ranging between $150 and $350. Mr. Bilbe and his employee claim the contract, both as to workmanship and materials had been faithfully fulfilled, and such defects as exist are not attributable to any dereliction on the part of the workman or to defective materials. The defense experts particularly said they could perceive no crooked lines of shingles.
The missing shingles can be readily accounted for. The testimony makes it certain this condition resulted from damage inflicted by high winds. But the multitude of cracked shingles poses a problem. The experts testifying for the defense vigorously disagreed with plaintiff's expert as to the cause. All said the cracking of the slates could have been caused by inexperienced persons walking upon the roof, and one expert dogmatically pronounced as his opinion that this was actually the cause.
The first leak seems to have occurred after the hurricane of September 1955 which occasioned winds reaching a velocity of 70 miles per hour. Mrs. Russell thereupon communicated with Bartlett who advised her to contact Bilbe Sheet Metal Works which she did. Harry F. Bilbe's inspection disclosed windstorm damage to the extent of $64.50, whereupon Mrs. Russell made claim with her tornado insurer, but the claim was never paid because of the policy provision requiring the insured to bear the first $50 of the loss and as the balance was considered insignificant, Mrs. Russell chose not to pursue her claim further. Windstorm damage was also experienced in February 1956, and Bilbe's estimation thereof was $45, but again there was no insurance adjustment because of the deductible provisions of the policy.
Upon his second examination, Bilbe observed the many cracked shingles and brought this to Mrs. Russell's attention. This appears to be the first notice she had that defects, other than windstorm damage, existed.
*774 Counsel for the defense can point to no evidence that would support the theory that the traversing by inexperienced persons of the rooftop was the cause of the cracking of the shingles. Any such theory that this was the cause could be at best only conjecture on the part of the witnesses. It is pointed up that a television antenna was erected upon the roof after Mrs. Russell moved into the premises, the inference being that the man performing the job negligently stepped upon the shingles which occasioned the damage. It was also deduced that because paint splashings appear that someone had painted a hatch cover on the roof and the rear cornice.
Mrs. Russell denied that anyone other than a workman she hired to replace a cap on a chimney and the man who erected the antenna ever climbed to the roof, and we are satisfied from her testimony there was no unusual amount of walking over the rooftop. To accomplish the cracking of the multitude of shingles the two individuals mentioned by Mrs. Russell would have had to walk over the entire roof as the cracking damage seems very prevalent, and we are sure they did not.
No one could read the expert testimony without leaving the record with the profound feeling that one set of witnesses or the other very loosely handled the truth. The conflicts in the testimony are absolutely irreconcilable and it is difficult from a reading of the record to determine just what witnesses and what portion of their testimony should be believed. However, one significant thing appears, and that is the plaintiff's experts say that the presence of the defects may be discerned by visual inspection and that a layman could observe their existence.
The trial judge stated in his reasons that he visited the premises on two occasions and climbed through a hatch-like aperture (the scuttle) and from this vantage point inspected the roof "using as a basis the expert testimony." What the judge's impressions were we do not know, but in view of the fact that the judgment runs in favor of plaintiff, it is certain his ocular examination sufficiently convinced him of the truthfulness of the plaintiff's experts.
The third-party defendant argues strenuously that the judge should not have based his opinion, either in whole or in part, upon his personal observations, and that whereas the judgment is so based, there is reversible error. Courts in other jurisdictions have had the opportunity to consider such a state of affairs as confronts us, and we find that they have not been of one mind with regard to the right of a trial judge to base his findings on the result of his own personal observations. In many of the cases holding there was no such right, the judge viewed the premises or locus in quo and formulated his opinion without any evidence in the record to support it or the opinion of the judge was contrary to the evidence. This, of course, was held to be error. In some cases upholding the right of a judge to make personal observations, it appears that where the evidence is in conflict, there would be reason to believe the independent investigation of itself might lead to a safe and satisfactory conclusion as to the merits of the case. See 97 A.L.R. 335 et seq.
In the instant matter the judge was confronted with irreconcilable conflicting evidence emanating from the two camps of experts as to what the condition of the roof actually was, and as the plaintiff's experts testified that a layman would be competent to observe the defects, this undoubtedly prompted his honor below to make his visits to the premises, and we are certain the observations he made from the scuttle aided him in resolving the question of veracity.
The issue regarding the court's visits to the premises was raised by the third-party defendant, yet on its behalf there were introduced into the evidence eight photographs of the roof which were referred to many times by counsel, both *775 in argument and in brief, and we were importuned to formulate certain conclusions based on the expert testimony in conjunction with an observation of the pictures. It is said the photographs bolster the testimony of the defense experts. Why, we ask, should counsel seek to have us decide the case on the basis of the photographs, yet he complains because the trial judge arrived at his conclusions after viewing the roof itself and comparing what he saw with the testimony he had before him? A trial judge has a perfect right in a proper case such as this to take into consideration his ocular observations made outside the courtroom of the locus in quo or the thing involved in the case, not for the purpose of supplying new evidence, but with the hope of determining, where the evidence is conflicting, just what testimony in the record is worthy of belief.
There is no persuasive reason why we should dishonor the finding of fact that defects existed solely because of inferior workmanship to such an extent that the roof should be replaced. To overthrow that finding of fact we would have to entirely disregard the testimony of plaintiff's experts plus the visual observations of the judge and to accept in lieu thereof the testimony of the other expert witnesses whose testimony the trial judge would not accept. We believe this to be a classic example where the trial judge is much more able than an appellate tribunal to resolve questions of fact. It is fitting to quote here what the Supreme Court said in the case of Holmes Company v. Foret, 229 La. 360, 86 So.2d 66:
"As a predicate in this suit we adopt the following well-stabilized jurisprudence of this Court that where the trial judge has seen, heard, and observed the witnesses and the many things that transpire in the courtroom that are not susceptible to being taken down by a stenographer, his judgment on a question of fact will not be disturbed unless manifestly erroneous. * * *"
The judge also found that the damage to the roof due to the September 1955 hurricane is not the cause of the present leaks; the failure to repair the storm damage had no effect on the present defective condition; said defective condition is the result of defects in workmanship in installing the roof and it existed at the time plaintiff bought the property; the curves in the shingles were not caused by swags in the roof; that the roof was certain to leak but the felt would temporarily retard a leaky condition; the alterations made on the interior of the premises by Mrs. Russell and her son, who moved into the property before the formal act of sale was passed, have nothing to do with the defects; that persons walking on the roof was not the cause of the leaks.
We find no manifest error in any of these findings, and there is testimony in the record supporting each and every one.
The LSA-Civil Code provides:
"Art. 2474. The seller is bound to explain himself clearly respecting the extent of his obligations: any obscure or ambiguous clause is construed against him."
"Art. 2475. The seller is bound to two principal obligations, that of delivering and that of warranting the thing which he sells."
"Art. 2520. Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice."
"Art. 2541. Whether the defect in the thing sold be such as to render it useless and altogether unsuited to its purpose, or whether it be such as merely to diminish the value, the buyer may limit his demand to the reduction of the price."
*776 Under LSA-C.C. art. 2521 apparent defects, that is, such as the buyer might have discovered by simple inspection, are not numbered among the redhibitory vices, nor can the buyer under LSA-C.C. art. 2522 institute the redhibitory action on account of latent defects which the seller has declared to him before or at the time of the sale.
It is earnestly contended that the defective roof condition might have been discovered by simple inspection, and as the vices were apparent, therefore they are not redhibitory. There is certainly no merit in this contention. This court in Kozlowski v. Fowler, La.App., 71 So.2d 246, held that the task of mounting a ladder and thereafter inspecting the roof and gutters in order to discover the extent of defective construction is an unreasonable burden to place upon the owner. We believe that the same reasoning can be applied in the instant case. For Mrs. Russell to have made an inspection of the roof would have entailed a negotiation of the attic and then a crawling through the scuttle onto the sloping roof, which, no one could doubt would be asking too much of her. Even if she had the hardihood of going out upon the roof by the means mentioned above, there would have been no view of the other side of the slope unless the lady could clamber over the ridge and onto the other side. A holding that the defects were not discoverable by simple inspection is in order. Likewise it is proper to say plaintiff was within her rights in relying on the representations of her vendors as to the fitness of the premises.
In Louisiana homesteads and building and loan associations play a leading role in the sales of immovable property on credit in that they finance the credit portion of numerous such transactions. The procedure is for the vendor to sell the property direct to the homestead association, which in turn sells to the vendee without warranty for the amount of the loan, retaining as security therefor a vendor's lienmortgage and privilege on the object of the sale. This is in compliance with LSA-R.S. 6:766. The defendants make the argument that the trial judge erred in overruling their exception of no cause or right of action which is based on the premise that the defendants were not the vendors of plaintiff but were mere predecessors in title of plaintiff's vendor, the homestead. It is pointed out, too, that the act of sale from the homestead association to plaintiff contains no warranty clause but only the subrogation of warranty. It is further contended the subrogation clause refers to warranty of title only and not against redhibitory vice.
The sales to and by the homestead which all occurred on the same day before the same notary public were made for a pignorative purpose only and through its sale to Mrs. Russell the homestead was able to accomplish the securing of the loan in the manner the law directs. The interposition of a homestead in such a transaction does not affect the relationship of vendor and vendee existing between the parties. This principle is highlighted in Overby v. Beach, 220 La. 77, 55 So.2d 873, 881, wherein the defense to an action for rescission due to fraud or error was that the defendant was not plaintiff's vendor but the homestead was. The Supreme Court disposed of the argument, calling it unrealistic, pointing out that the only purpose of the sale by the homestead was to vouchsafe to it a vendor's lien and privilege on the property. The Court had this to say:
"It is further argued that plaintiff is without a cause of action against the Babins because she did not purchase the property from them but from the other defendant, French Market Homestead Association.
"This proposition is unrealistic. The fact is that plaintiff negotiated with the Babins with whom she entered into a written contract of sale and purchase of the real estate in question, subject to a homestead loan and other conditions. The sale by the Babins to the *777 homestead and the resale on the same day by the homestead to plaintiff was solely for the purpose of securing to the homestead a vendor's lien in accordance with law. Section 50 of Act 140 of 1932, LSA-R.S. 6:766. There is nothing in our recent decision in Hausler v. Nuccio, 214 La. 1069, 39 So. 2d 734, relied on by defense counsel, which militates against this view."
But, be that as it may, LSA-C.C. art. 2503 seems to provide a remedy to the vendee whose vendor has excluded warranties by providing:
"The parties may, by particular agreement, add to the obligation of warranty, which results of right from the sale, or diminish its effect; they may even agree that the seller shall not be subject to any warranty.
"But whether warranty be excluded or not the buyer shall become subrogated to the seller's rights and actions in warranty against all others."
Even though LSA-C.C. art. 2503 appears in that portion of the Code dealing with the seller's warranty of eviction, the argument that its terms are applicable solely to the warranty of eviction is utterly without force in view of the decision of the Supreme Court in the case of McEachern v. Plauche Lumber & Construction Co., Inc., 220 La. 696, 57 So.2d 405, holding that the subrogation of warranty clause extends as well to the warranty against redhibitory vices. In the instant case LSA-R.S. 6:766 precluded any warranty being made by the homestead association in its sale to the borrower, but in the homestead sale to Mrs. Russell there was subrogation of warranty, and under the provisions of the second paragraph of LSA-C.C. art. 2503, the purchaser became subrogated to any right of the homestead to proceed against its vendors on the warranty against vices and defects in the thing sold. The action quanti minoris has been accorded to a homestead's vendee. Lemonier v. Coco, 237 La. 760, 112 So.2d 436; and Deshotel v. Higgins, La.App., 109 So. 2d 805, the latter case being decided by the predecessor of this court.
The argument that vices in construction of an immovable are not redhibitory must also fall. Diligent counsel have resorted to earlier jurisprudence and also to views expressed by the French commentators on the subject matter in order to support their position, but, of course, the question must be determined on the basis of later and prevailing jurisprudence. It is no longer an open question that vices of construction existing in immovable property may form the basis of an action in redhibition or quanti minoris. Bayou Rapides Lumber Co. v. Davies, 221 La. 1099, 61 So.2d 885; Tuminello v. Mawby, 220 La. 733, 57 So.2d 666; Johnson v. Hunter, La.App., 88 So.2d 467, and many other cases. The extent of the vices need not be as great in an action for reduction of the price as is required to support the action of redhibition. See 23 T.L.R. 96 at pp. 99, 100.
The defense of prescription of one year pleaded below by the third-party defendant is without validity. The fact that Bilbe Sheet Metal Works guaranteed the roof only for one year from the date of completion of the job in no way precluded the bringing of the third-party action for breach of contract after one year. The term of the guarantee is not a period of prescription. The third-party action is founded on the provisions of LSA-C.C. art. 2769 which are to the effect that if an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his noncompliance with the contract. This action is not prescribed by one year. See LSA-C.C. art. 3544. The one year contractual guarantee merely provides the term within which the defect must become apparent, and the evidence in this case makes it certain *778 that the defects made their appearance within the term of the guarantee.
Nor can the plea of one-year prescription interposed by defendant be sustained. The exception is grounded on the fact that the evidence disclosed that plaintiff had been in partial occupancy of the premises since about June 6, 1955, when her son and his classmate inhabited the premises. It is argued to us under the provisions of LSA-C.C. art. 2546 the one-year prescriptive period for the action quanti minoris begins to run from the date the vice is discovered, and that plaintiff's son must have discovered the defective condition of the roof during his occupancy which was more than a year prior to the filing of the suit. Such fact does not exist. No one discovered the roof was defective until Bilbe made his second examination after the storm of February 1956 and this suit was instituted well within a year therefrom.
We believe, however, the trial court did make one error and that is in the matter of quantum. He allowed a reduction in price of $1,225 based on the lowest estimate of plaintiff's experts. Ratleff said the cost of replacement would be $1,250. Palermo said the cost would be $1,225. The evidence shows Ratleff is an employee of Edw. Chassaniol, Jr., Roofing & Siding, Inc., and in that capacity his inspection was made. Report of his findings was made to his employer. On March 22, 1956, the employer, on the basis of Ratleff's report, addressed a letter to plaintiff's attorney stating that an inspection of the roof disclosed about 1,500 cracked shingles and suggesting that the present shingles be removed and a new asbestos roof applied which "we can do for the sum of $1,110.00," which is less than what the two witnesses said the cost would be. We think determination of the amount of the cost for remedying the defects should be made on the basis of Chassaniol's bid rather than on the estimate of its employee, Ratleff, or that of Palermo, the other of plaintiff's witnesses.
The amount should be further reduced by $109.50 representing the aggregate wind damage incurred by the roof in September 1955 and February 1956. LSA-C.C. art. 2533 provides that if the thing
"* * * has perished by a fortuitous event, before the purchaser has instituted his redhibitory action, the loss must be borne by him.
"But if it has perished, even by a fortuitous event, since the commencement of the suit, it is for the seller to bear the loss."
These provisions are broad enough in scope to encompass the partial destruction of the thing by fortuitous event, and whereas Mrs. Russell had not instituted her action before the damage occurred, she must sustain the partial loss occasioned by the high winds.
The liability of the third-party defendant flows from LSA-C.C. art. 2769.
For the reasons assigned, the judgment appealed from is amended so as to reduce the judgment in favor of plaintiff and against defendants to the sum of $1,000.50, and defendants' judgment against Bilbe Sheet Metal Works and its partners is reduced to a like amount, and as thus amended and in all other respects, the judgment is affirmed. Plaintiff is to pay the cost of appeal.
Amended and affirmed.