186 So.2d 188 (1966)
Hugh T. ROBERTS
v.
Dennis M. BOULMAY.
No. 2193.
Court of Appeal of Louisiana, Fourth Circuit.
May 2, 1966.
*189 Schoemann, Gomes, Ducote & Collins, Monte J. Ducote, New Orleans, for plaintiff-appellee.
Cabral & Cabral, Harry R. Cabral, Jr., New Orleans, for defendant-appellant.
Before YARRUT, CHASEZ and BARNETTE, JJ.
BARNETTE, Judge.
The defendant has appealed from a judgment in favor of plaintiff in the principal sum of $522 in a redhibitory action, or, more correctly, an action in quanti minoris, on account of certain vices or defects in a house purchased by plaintiff from defendant.
On June 4, 1962, Hugh T. Roberts purchased from Dennis M. Boulmay, through the Citizens Homestead Association, a house and lot in the City of New Orleans to be occupied by him as a residence. The house had been built by Dennis M. Boulmay, or for his account, with the intention of being used as his home. Boulmay changed his plans and moved into another house. After completion the house in question remained empty for about thirteen months, when plaintiff purchased it and moved in with his wife and their two children.
About three months after moving into his new home, plaintiff discovered certain *190 alleged defects or vices which gave rise to this suit. Plaintiff alleged the cost of correcting the vices and defects to be $12,900.
Some twelve specific defects were listed in plaintiff's petition, but before trial they were reduced to the following seven:
Defective installation of tile in both bathrooms, which caused consequential damage to a rug in an adjoining bedroom,
Absence of an air-conditioning duct,
Failure to treat properly the concrete slab which resulted in termite damage,
Dishwasher improperly installed,
Improper and defective wiring in violation of City Building Code,
Absence of guttering, and
Closet doors improperly installed.
The defendant's father, a building supervisor for the contractor who built the house, personally supervised its construction and was instrumental in his son's acquiring it for a home. Plaintiff evidently made no complaint to the seller or his father and filed this suit exactly one year after the act of sale was passed. Had the plaintiff made demand upon defendant for repair or correction of the defects timely, it is very probable that the builder would have made the necessary repairs or called upon the subcontractors to do so, but plaintiff's failure to make demand or give notice of the defects does not preclude his recovery of reasonable costs in correcting the defects complained of.
Our jurisprudence clearly provides that vices of construction existing in immovable property may form the basis of an action in redhibition or quanti minoris. Russell v. Bartlett, 139 So.2d 770 (La. App. 4th Cir. 1961), and cases cited therein.
Plaintiff labeled his petition "Redhibitory Action" but it is more correctly a suit in quanti minoris since he is not demanding the avoidance of the sale but prays for a money judgment covering the cost of making the necessary repairs to correct the alleged defects, which is in effect merely a reduction of the price. His action is governed by the rules and limitations applicable to redhibitory actions, LSA-C.C. arts. 2520, 2521, 2530, 2531, 2534, 2541-2544.
Of the seven alleged vices or defects upon which the case went to trial, only four have been proved sufficiently to support a cause of action under the authority of the Codal provisions. We will first dispose of the other three.
The absence of an air-conditioning duct in one of the rooms and the absence of guttering, if such may be considered to be defects. Were certainly "apparent defects" which the plaintiff might have discovered by simple inspection and are not redhibitory vices. No action will lie on their account. LSA-C.C. art. 2521. We seriously doubt that the absence of these things are vices or defects.
The house in question was built according to specifications which did not provide for these items. Plaintiff bought the house as it was. If the omission of these features did constitute defects, it certainly did not require more than a simple inspection by a nonexpert person to discover it. The builder explained that louvres were provided in the doors to the room in which the air-conditioning duct was absent. This type of construction could easily have been discovered by simple inspection. Likewise, the absence of the gutter, which allegedly caused rainwater to fall alongside the house and leak through the windows, could have been discovered by simple inspection.
The alleged failure to treat properly the concrete slab and resulting termite damage must be rejected for want of proof. Mr. A. L. Norris, a pest control expert, was called by plaintiff to testify regarding *191 his inspection of the property in question for termite damage and for provisions for termite control. He testified that he found that no tubing had been installed in the construction of the house through which termite control chemicals could be injected into vital areas. He said "* * * in some constructions some contractors call for tubing to be there * * *." There is no evidence whatever that there was any representation made to plaintiff about such tubing. It is not shown to be a required specification or one which ordinarily might be expected to be included in such construction. The absence of such is not a vice or defect. Mr. Norris found no evidence of termite damage.
We do find, as did the trial judge, that there were defects in the installation of the tile in the two bathrooms; that the dishwasher was not bolted down; that there were some defects in the electrical wiring; and that the sliding closet doors slipped off of the track which caused them to malfunction. All of these are relatively minor defects except the defective tile in the bathrooms.
Mr. Irwin B. McAdams and Mr. Irving J. Smith testified as experts in ceramic tile installation. They each described the tile installation in the bathrooms as the "thin-set" method. This method consists of applying the tile directly to Sheetrock by means of a waterproof latex adhesive. The more conventional method is the construction of a concrete base over metal lath with application of the ceramic tile directly to cement mortar. Upon drying it is firmly set in the mortar. The so-called "thin-set" method is cheaper but is acceptable in many building specifications.
The damage resulted from the grouting falling out of the tile joints permitting water to seep through. The Sheetrock became soaked, and, as it disintegrated, the tiles fell off. Obviously the longer the shower was used, once this seepage began, the worse it became. Several tiles fell from the shower walls in the smaller bathroom. No tiles had fallen from around the tub in the larger bathroom, but some or the tile joints were opening and needed to be regrouted or "pointed up."
Mr. McAdams testified that plaintiff did not want the tiles replaced by the "thin-set" method, but by the more expensive conventional method described above. Since both experts testified that the "thin-set" method is acceptable and is in fairly common usage in new residential construction, we must conclude that there was no vice or defect in the basic method of tile installation in the bathrooms. Plaintiff therefore can claim no more than the cost of repair in accordance with its original construction. Upon being reimbursed on this basis he can then make repairs by whatever method he chooses.
Mr. McAdams' estimate for making the necessary repairs according to the more expensive conventional method which he recommended was $268 in the shower bath and $139 around the tub. When questioned about the cost of simply making necessary repairs, he answered:
"Cost-wise it's to go in and replace the base and two rows of tile, the floor and the curb and about the amount of damage that was done I'd say the cost would be approximately $135.00 excluding any plumbing, of course."
Mr. Smith estimated cost of repair in the tub alcove at $175 and in the shower stall at $279 based on the more expensive conventional method which Mr. Roberts wanted done. He then testified on cross-examination as follows:
"Q Mr. Smith, on both of the bathrooms involved here, could the tile have been repaired that was presently there?
"A Oh, yes.
"Q Is that a large job or a small job?
"A Well, it's not a real small job but it's not a real large job either. I never estimated what it would cost to repair it because I wasn't asked.

*192 "Q Be considerably less than the replacement of this entire thing?
"A Oh, definitely."
We have, therefore, only one specific estimate of the cost of simple repair of the shower stall and that is $135. There is no specific estimate of the cost of regrouting or "pointing up" the tiles in the tub bathroom. We assume this would be relatively nominal. We think plaintiff is entitled to an award of $135 for repair of the defective ceramic tile in the shower bath stall.
There is no testimony to support plaintiff's allegation that the dishwasher was improperly installed except that it was not screwed or bolted to the floor. This is not necessarily improper according to the testimony of Mr. Smith who generally does not bolt them down. He did not recommend that anything be done to the dishwasher. He did admit that it was loose and that Mr. Roberts reported that it "was moving around." We must conclude that plaintiff has failed to prove a defect in the installation of the dishwasher except the negligible failure to bolt it down.
There were some defects in the electrical wiring for which plaintiff is entitled to an award. We will base this award on the expert testimony of Mr. Jack Nicosia, a licensed electrician.
Mr. Roberts had added a pantry and a utility room to his house. Mr. Nicosia's estimate totaled $130 for all necessary corrections to the electrical wiring. Of this amount, $45 was included for the utility room and $15 for the pantry. Thus the cost of corrections for which defendant is liable is $70.
The closet doors were referred to as "pre-hung" units. These are sliding doors mounted on rollers in a track fastened into a frame. The rollers had in some manner become loose and did not track properly. From the testimony in the record, it does not appear that any serious defect was proved. A minor repair by replacement of screws and adjustments is all that is indicated. No proof has been submitted of this cost, but evidently it would be nominal.
Plaintiff demanded complete replacement of the closet doors with new frames, tracks, refinishing, etc. For three sets of double doors the estimate of Mr. Smith was $2,225. The necessity for this is in no manner shown by the testimony and must be rejected.
Considerable testimony was devoted to alleged damage to the carpet in a bedroom caused by seepage from the shower bath. We have given no consideration to this item of damage which was amicably settled between plaintiff and defendant. Prior to plaintiff's purchase of the property, vandals had entered and seriously damaged the same carpet. An agreement was reached whereby the defendant would replace it. In connection with the purchase of the house, plaintiff gave defendant two post-dated checks for $100 each and thereafter stopped payment. Later they agreed that defendant would not be required to replace the carpet upon relieving plaintiff of obligation on account of the checks. Mr. McAdams, who also qualified as a floor covering expert, testified that the cost of a new carpet over the old pad would be $140. Therefore, whatever water damage the carpet might have suffered was more than compensated for in the $200 defendant allowed plaintiff for carpet replacement.
The trial judge did not give reasons for judgment and did not itemize the award of $522, and we have no way of knowing on which items he awarded plaintiff recovery, or in what amount. It is our opinion that an award of $135 should be made for the repair of the shower stall; $70 for the correction of defects in the electrical wiring; and $50 for the minor items of grouting around the bathtub, bolting down the dishwasher and adjusting the sliding door rollers and tracks, making a total of $255. In making the $50 award for the three *193 relatively nominal items, we are not unmindful that there is no specific testimony in the record to support our estimate. Obviously plaintiff is entitled to recover something for these items, but to remand the case for further testimony on these rather inconsequential items would be impracticable. The cost involved would be disproportionate to any conceivable advantage to either party. We have exercised our discretion in this respect on the authority of LSA-C.C.P. art. 2164.
Expert witness fees were allowed and taxed as costs in the amount of $50 for Mr. Norris and $25 each for Messrs. McAdams, Smith, and Nicosia. We can find no justification for the allowance of the $50 fee for Mr. Norris, the pest control expert, since plaintiff failed to establish any material fact by this witness.
The judgment is amended to reduce the award to plaintiff from $522 to $255 and to strike therefrom the item of $50 as expert witness fee for A. L. Norris and, as thus amended, is affirmed at appellant's cost.
Amended and affirmed.