271 So.2d 346 (1972)
BEWLEY FURNITURE COMPANY, INC., Plaintiff-Appellant,
v.
MARYLAND CASUALTY COMPANY et al., Defendants-Appellants-Appellees.
No. 11973.
Court of Appeal of Louisiana, Second Circuit.
December 4, 1972.
Rehearing Denied January 9, 1973.
Writ Granted March 8, 1973.
*347 Wilkinson, Woods, Carmody, Meadows & Hall by Charles B. Peatross, Shreveport, for Bewley Furniture Co., Inc., plaintiff-appellant.
Cook, Clark, Egan, Yancey & King by Frank M. Cook, Shreveport, for Maryland Casualty Co., Mitchell Builders and Paul and E. P. Mitchell, defendants-appellants.
Feist, Schober & Howell by James Fleet Howell, Shreveport, for Wesley D. Glassell, d/b/a W. D. Glassell Co., defendant-appellant.
Lunn, Irion, Switzer, Johnson & Salley by Richard H. Switzer, Shreveport, for Star Manufacturing Co., defendant-appellant, and Home Indemnity Co., defendant-appellee.
Mayer & Smith by Chas. L. Mayer, Shreveport, for United States Fidelity & Guaranty Co., defendant-appellee.
Before AYRES, BOLIN and HEARD, JJ.
En Banc. Rehearing Denied January 9, 1973.
BOLIN, Judge.
Plaintiff, Bewley Furniture Company, Inc., filed suit on November 1, 1968, against Paul C. and E. P. Mitchell Builders, Paul C. and E. P. Mitchell, individually, general contractors, Maryland Casualty Company, surety on the Mitchells' construction bond, Wesley D. Glassell d/b/a W. D. Glassell Company, project engineer and subcontractor, and Star Manufacturing Company, building manufacturer, in solido, asking $425,000 for faulty construction and installation of a defective roof and damages allegedly resulting to the interior and contents of its store and warehouse. Subsequently plaintiff amended its petition to include United States Fidelity & Guaranty Company, Glassell's insurer, and Home Indemnity Company, Star's insurer, as parties defendant. Numerous pleadings were filed, including third party demands by Glassell against his air conditioning subcontractor, B. Segall Company, Inc., and G. L. Jennings Construction Company which subcontracted to erect the metal building, and its insurer, Coal Operators Casualty Company. Third party demands were also made by defendants Mitchell Builders, the Mitchells individually, and Maryland Casualty Company against Glassell and Star and their insurers, and by Segall against V. N. Wiggins d/b/a Wiggins Sheetmetal Company, his subcontractor. Glassell's third party actions against Segall and Jennings and his insurer were both settled and dismissed during trial and these third party defendants are no longer parties to this appeal.
*348 In its decision the lower court ruled upon several motions as well as upon the merits. It sustained pleas of prescription by United States Fidelity & Guaranty and Home Indemnity and overruled exceptions and pleas of res judicata and estoppel by Star, Glassell and their insurers. Judgment was rendered in favor of Bewley against Maryland Casualty, Star, the Mitchells and their partnership, and Glassell, in solido, in the amount of $44,699 plus interest; and in favor of Bewley against all the above, except Maryland Casualty, in solido, for $35,301 plus interest. The third party actions of the Mitchells and their partnership and Maryland Casualty Company were rejected. Costs, including expert witness fees, were assessed against all defendants. All original defendants and Bewley appealed. For reasons hereinafter assigned the judgment of the lower court is amended to decrease the award but reversed as to the liability of United States Fidelity & Guaranty and Home Indemnity.
Bewley's original furniture store building, located in Shreveport, Louisiana, was destroyed by fire in February 1966, and a temporary store was opened at the fair grounds, which had to be vacated when the state fair opened, and Bewley needed a building which could be constructed quickly. In June of 1966, plaintiff entered into a contract with the Mitchells for the construction of a metal building in which to house its store and warehouse, to be located on a four-acre tract on 70th Street. The building was to contain approximately 78,000 square feet. Glassell, project engineer and subcontractor, designed the plans and specifications with Star's engineers. Glassell, Star's local representative, ordered the building components from the latter. Glassell then contracted with Jennings to erect the building. At the time of the contract, Maryland Casualty provided the performance bond for the Mitchells, which bond was timely recorded. Upon its expiration a one-year maintenance bond was issued in November 1967.
Construction was completed in October 1966 and Bewley opened in early November. Star provided a five-year building warranty covering defective composition of the building materials, Star's workmanship, and design faults. Leaks began to appear immediately after the building was occupied and continued to appear up to the trial date. Over a two-year period the principal defendants assured plaintiff the leaks could be stopped and numerous attempts were made by a number of defendants and their employees to repair the roof, but to no avail, and this suit resulted.
Bewley contends the defective roof was due to: (1) faulty materials, i. e., low yield steel and defective sealant; (2) faulty workmanship, i. e., defective erection, improper insertion of screws, misalignment of sheets, endlaps and sidelaps, erratic application of sealant, and lack of supervision; and (3) faulty design, i. e., inadequate slope, inadequate building materials and defective sheet lap design.
The trial judge concluded the evidence was insufficient to show the defects in the roof were the result of faulty materials as they were initially furnished by Star. While it is undisputed a light gauge steel was used, he found no evidence to support the contention that the roofing panels were improperly constructed. The most unfavorable testimony relative to the quality of the material came from Mr. Gibson, an engineer testifying for plaintiff, who stated the product was marginal and that Star's quality control was non-existent. This testimony was effectively refuted by Mr. Scruggs, Star's employee in charge of quality control at the time. The court decided that even if it was marginal, "marginal" means only that while the steel used was not as heavy or as strong as other steel, it was in no way substandard and concluded that, if installed properly, there was no showing the metal panels would have bent or crimped more readily than any other grade of steel. The trial judge further found the contention that the sealant itself was defective was *349 not substantiated by the evidence. We agree with the conclusion that the materials were not faulty, per se, but find ourselves unable to agree that the metal panels would not bend or crimp more easily than a heavier grade or that the sealant was not of poor quality.
As to faulty workmanship, the evidence is most conclusive. Glassell, in his third party demand against his subcontractor, Jennings, alleges he was forced to expend over $5,000 in making necessary alteration and adjustment with regard to the roof in order to place it in the condition contemplated in his agreement with Jennings. Photographic evidence and the testimony of all witnesses who inspected the roof confirm that the endlaps and sidelaps did not properly mate, that the sheets were misaligned, that the caulking was ineffective and that hundreds of additional screws had been added in order to hold the panels in place, and each screw created a new hole for potential leakage. We agree with the trial judge that faulty construction was the major cause of the leakage.
As to plaintiff's defective design allegations, the trial court held that the present slope of the roof was inadequate. Star and Home Indemnity alleged the lower court erred in its factual conclusion that Star was responsible for improper design of the slope, i. e., one in twenty-four inches, and further in finding that this slope resulted partially, at least, in the roof leaking and water entering the building. They urge this finding was manifestly erroneous and this court should examine the facts as well as the law and reverse the holding since "the court below found nothing to implicate Star other than its alleged conclusion that it was improper to design a roof on a building of this size with a slope of one in twenty-four inches rather than one in twelve inches."
Plaintiff's expert, Gibson, testified the design was marginal while another expert, Hollowell, testified the slope was far too low for that type of construction and material. Plaintiff's attorney further elicited testimony from Simpson and Barbaree, two of defendants' witnesses, and Glassell that the steeper the slope the faster water will roll off, preventing a tendency of the water to "pond". Other witnesses, however, testified to the contrary. Mr. Demopulos, a consulting engineer and witness for Glassell, stated that he had just completed a building of 30,000 square feet of roof with a one in twenty-four inches slope, and in his opinion it would make no difference in the slope if a larger space (width) was covered. He admitted, however, that he would expect leaks which would require constant maintenance.
Star's employees felt there was nothing wrong with such a slope and cited their own plant of 200,000 square feet as having a one in twenty-four inches slope.
Hollowell, who had been contacted by Bewley about putting on a built-up roof over the existing roof, testified that although a new roof, installed on a decking over the existing roof, would also have a one in twenty-four inches slope, it would effectively prevent leaks because designed differently and constructed of different materials.
Mr. Simpson, Star's vice president of production and planning, was asked on cross-examination about the inherent defects in the design of the roof. The gist of his testimony was that, given the combination of ordinary workmanship, as known in the industry, and the design, in the ordinary course of events you would expect to get water up under the sidelaps into the area of the permanent dam (provided by the mastic) which probably will cause a leak. This, in fact, is what happened. Further, Simpson examined the mastic and found in many places it had no elasticity, life or sealing quality. He testified that most metal roofing contractors had ceased to use this material and had switched to another brand of sealant, achieving much better results. He examined the roof after a rain and found pressure on the laps *350 would cause water to "squirt" out from under the laps.
The testimony and the physical evidence prove there was excessive and continuous leaking, even after two years of unsuccessful attempts to repair the leaks.
We have examined the lengthy testimony of the various experts and witnesses having knowledge of this particular building, as well as the numerous documentary and material exhibits, and have concluded the design of the roof, as prepared by Star in conjunction with its agent Glassell, was faulty in five particulars: (1) the metal used for the roof was, at least, marginal and was easily dented or crimped by persons working on the roof; (2) these dents or crimps allowed "pooling" after a rain which could cause backing up of water into the sidelaps and thus leakage through any screw holes which might not have been properly sealed; (3) the sealant was ineffective in many instances; (4) the one in twenty-four inches slope was patently inefficient to carry off water from this large building; finally (5) the size of the building (78,000 square feet) required a different type roof which could have been made watertight either initially or by proper and immediate repairs. These inherent defects in design, combined with the admittedly faulty installation resulted in the damage to the spray-on insulation, the rockwool batting, the ceiling panels in the store area and the spotting of the rug and damage to the contents of the store.
We turn now to Bewley's contention that the court erred in upholding the pleas of prescription filed by United States Fidelity & Guaranty and Home Indemnity Company. On this point we believe the court erred. This suit was a suit for damages resulting from breach of contract by the Mitchells, Glassell and Star. Insofar as the policies of United States Fidelity and Home, it is urged that although the policies refer to coverage for damages resulting from accident, the "accidental" damage is not confined to tort liability. The breach of defendants' contract with Bewley, be it the result of negligence, accident or design, was the cause of the damage.
On October 10, 1966, Star had issued a five-year building warranty covering the Bewley furniture store and warehouse, which warranty specifically covered any defects in the composition of building materials, Star's workmanship and faults inherent in the building design. This warranty was accompanied by a letter, dated October 10, 1966, from W. V. Voss, Star's president, which expressed confidence in the product and assured plaintiff that if plaintiff should need further service to call on Star. Plaintiff did need further service and it did call on Star, but now Star claims the warranty has not been breached.
We find Star warranted its product and building design to plaintiff and plaintiff relied on this warranty; that this warranty has been breached and plaintiff has suffered damages as a result thereof. In addition, Star employees undertook to make certain repairs to the roof in the summer of 1967, but these attempts were ineffective, as the roof continued to leak. One of Star's employees told plaintiff's management that when they completed the repair work the roof would not leak again. However, Paul C. Mitchell testified that in July of 1967, immediately after these repairs, he went to the store during a rain and observed that the roof was leaking badly.
Plaintiff also named The Home Indemnity Company as a defendant herein, alleging the latter was liable to plaintiff under its policy or contract of professional liability and/or products liability issued by Home Indemnity to Star for the years 1966, 1967 and 1968.
Section II, Subsection F, of this policy, as amended by an endorsement attached to the policy, provided comprehensive general liability coverage in an amount up to $300,000 for property damage "due to an occurrence" arising out of the insured's *351 business. Occurrence is defined in the policy as meaning:
". . . exposure of persons or property to conditions which produce bodily injury or property damage . . . ." (Emphasis ours)
Under this section of the policy all occurrences are covered unless specially excluded therein. Admittedly, there is an exclusion in this policy for liability assumed under contracts or agreements. This exclusion is found under Subsection "b" of the exclusion provision of Section II of the policy and it reads in full as follows:
"This policy does not apply . . . (b) under Coverages E and F, to liability assumed by the insured under any contract or agreement, except an insured contract." (Emphasis ours)
In this regard, "insured contract" under the policy is defined in the policy as:
"`INSURED CONTRACT' means a warranty of the Named Insured's products. . ." (Emphasis ours)
* * * * * *
"`Named Insured's Products' means goods or products manufactured, sold, handled or distributed by any Named Insured or by others trading under his name, . . . ."
Since we have found Star's liability is predicated upon its defective design, and not upon "goods or products" which it sold to the contractor, we conclude the exclusion is applicable. Nevertheless, under the general liability provision of the policy, Home is liable for the water damages resulting from the defective roof.
United States Fidelity and Guaranty Company filed a plea of one year prescription based on the premise that its policy covers only the tortious acts of its insured, Wesley D. Glassell, and this plea was sustained by the trial court. We find this policy was not intended to be so restricted as was shown by the fact that the policy states the insurer will pay on behalf of its insured any sums he is "legally obligated" to pay because of an "accident". There is no provision in the insurance contract which limits its coverage to the insured's ex delicto conduct and the contract covers the insured's action in warranty, tort and contract. In brief to this court, United States Fidelity & Guaranty concedes the damages suffered were caused by Glassell's negligence which is termed as an "accident". However, it is not conceded the policy covers breach of contract damages caused by "accident".
It is asserted by United States Fidelity & Guaranty that the words "caused by accident" pertained only to tortious conduct of the insured. The words "caused by accident" in insurance policies identical to the policy in question have been held to have a much broader meaning and the courts have declined to limit its meaning to an event which happens suddenly or violently. See Hauenstein v. St. Paul-Mercury Indemnity Company (1954), 242 Minn. 354, 65 N.W. 2d 122, and Geddes & Smith, Inc. v. St. Paul-Mercury Indemnity Company (1965), 63 Cal.2d 602, 47 Cal.Rptr. 564, 407 P.2d 868.
We believe that limiting the coverage under United States Fidelity & Guaranty's policy to the ex delicto acts of Glassell would fail to accord the full and proper interpretation to the contract. In any event, any uncertainty or ambiguity in the policy's provisions must be construed against United States Fidelity & Guaranty. Hebert v. North British & Mercantile, Inc., Co., Ltd. (La.App. 3d Cir. 1967), 204 So.2d 655. In addition, insurance policies are to be construed in their ordinary and popular sense, rather than in a limited and technical sense, with any ambiguities construed against the insurer which prepared the policy and in favor of coverage. See Louisiana Civil Code Article 1947 and Article 1957. See also Conner v. Motors Insurance Corp. (La.App. 3d Cir. 1968), 216 So.2d 555; Seguin v. Continental Service Life and Health Ins. Co., 230 La. 533, 89 So.2d 113 (1956); and Standard Life Ins. *352 Co. of Indiana v. Hughes (5th Cir. 1959), 240 F.2d 859. On the basis of the language of the policy, its intent, and the above codal article and cases, we find the policy is not restricted to the tortious conduct of Glassell, but also covers his acts in contract and warranty.
Alternatively, United States Fidelity & Guaranty contends it cannot be held liable for the replacement of the defective roof but only for damage which the defective roof "caused". With this we agree. See Vobill Homes, Inc. v. Hartford Accident & Indemnity Company (La.App. 3d Cir. 1965), 179 So.2d 496 (writ refused).
Assuming the policy covered only the ex delicto conduct of Glassell, it is apparent from the testimony and evidence adduced at the trial that plaintiff was not aware of the extent of the defective condition of its roof until Star's engineer came to Shreveport in the summer of 1968 and inspected the roof. Subsequent to this inspection, plaintiff's employees were informed the roof was in such a condition it could not be repaired. Prior to this time, all of the defendants had specifically told plaintiff the roof could and would be repaired. Even at the time of trial, some of the defendants were still maintaining, despite much testimony and evidence to the contrary, that the roof could be repaired and that the problem was minor, i. e., "four tiny, minor, localized leaks."
Although Bewley was aware the roof leaked, it was assured by defendants the roof was sound and serviceable and the leaks could and would be stopped. Analogizing this building contract to one of sale, it is clear prescription does not begin to run until all repair attempts have ceased and the nature and extent of the damage is known by the plaintiff. See Brown v. Dauzat (La.App. 3d Cir. 1963), 157 So.2d 570 and Russell v. Bartlett (La.App. 4th Cir. 1961), 139 So.2d 770. As previously stated, this was not until the summer of 1968 and this suit was timely filed on November 1, 1968. The defendants, through their representations and promises, lulled the plaintiff into a false security. The doctrine of contra non valentem agere non currit praescripto (no prescription runs against a person unable to bring an action) is embeded in the civil law and in Louisiana jurisprudence. See Quierry's Executors v. Faussier's Executors (La.S.Ct. 1817), 4 Mart., O.S., 609; Morgan v. Robinson (La.S.Ct.1822), 12 Mart.,O.S., 76, 13 Am.Dec. 366; and R. J. Reynolds Tobacco Company v. Hudson (5th Cir. 1963), 314 F.2d 776, wherein the court stated:
"The doctrine is a principle of equity and natural justice, applicable in Louisiana when there is an impossibility to interrupt prescription by suit or when the inability of the injured person to sue is caused by the offending person's misconduct, fraud or concealment. The doctrine of `contra non' is therefore used as an equitable estoppel in those cases in which the facts justify its application."
We find the policy was, by its own terms, not limited to the tortious acts of its insured, Wesley D. Glassell, but, even if so limited, plaintiff was misled by the representation of Glassell and the other defendants and we think the doctrine of contra non valentem agere non currit praescripto is applicable to this situation.
The trial court sustained the pleas of prescription of United States Fidelity & Guaranty Company and Home Indemnity Company but awarded plaintiff judgment for damages totaling $80,000, itemized as follows: $44,699 against Maryland Casualty, Star, Mitchell Builders and Paul C. Mitchell, Jr., E. P. Mitchell and Wesley D. Glassell d/b/a W. D. Glassell Company, in solido, for replacement of the roof; $35,301 against Star, the Mitchells and Mitchell Builders, Wesley D. Glassell d/b/a W. D. Glassell Company, in solido, for the damage to the interior and contents of the building. All other demands, including third party demands, were rejected.
*353 The only evidence relative to the cost of replacing the roof is found in a letter written by Glassell estimating such cost at $44,699. Evidence as to the cost of reinsulating the interior of the roof was estimated by Spray Insulators at $26,550. However, in its original and first supplemental and amended petition plaintiff only prayed for total compensation of $25,000 to its store and warehouse and, therefore, plaintiff's recovery for these damages will be limited to that amount. And finally, although the amount is not established with certainty, we think it is evident, as reflected by the photographs, the testimony and other evidence, that the damage to the furniture, carpet and ceiling panels merits a substantial award which we fix at $10,000.
For the reasons assigned in our decision, we hereby reverse the judgment of the lower court insofar as it sustains the plea of prescription of United States Fidelity & Guaranty Company and Home Indemnity Company, and it is now ordered, adjudged and decreed that there be judgment in favor of Bewley Furniture Company, Inc., and against Maryland Casualty Company, Star Manufacturing Company, Paul C. and E. P. Mitchell, Builders, Paul C. Mitchell, Jr., E. P. Mitchell, and Wesley D. Glassell d/b/a W. D. Glassell Company, in solido, for $44,699.00 with legal interest from date of judicial demand until paid.
It is further ordered, adjudged and decreed that there be judgment in favor of Bewley Furniture Company, Inc., and against Star Manufacturing Company, Paul C. and E. P. Mitchell, Builders, Paul C. Mitchell, Jr., E. P. Mitchell, Wesley D. Glassell d/b/a W. D. Glassell Company, United States Fidelity & Guaranty Company and Home Indemnity Company, in solido, in the sum of $35,000 with legal interest from date of judicial demand until paid, and all costs including $500 fixed as expert witness fees.
In all other respects the judgment of the lower court is affirmed.