275 So.2d 665

**Luclile FOWLER**

**v.**

**FAYCO, INC., a corporation, et al.**

**SC 72.**

Supreme Court of Alabama.

Feb. 22, 1973.

Rehearing Denied April 19, 1973.

Fred Blanton, Birmingham, for appellant.

Holder & Moore, Fayette, for appellees.

**HARWOOD, Justice.**

This is an appeal from an order and decree denying injunctive relief and damages because of an alleged private nuisance.

In substance the bill averred that the complainant, Lucille Fowler, owned and occupied a home on property in Fayette County, Alabama; that the respondent Fayco, Inc., leased property across the road from complainant's property on which it operated an asphalt plant, which plant from the commencement of its operation emitted "vile and noxious fumes, odors and polluting matter into the air resulting in depreciation to complainant's property, and injury to her health."

The bill prayed for an injunction prohibiting the continued operation of the plant, and for damages to the property, and for injuries to the complainant's health.

The respondent, Fayco, Inc., filed an answer to the bill in which it denied that its asphalt plant has emitted vile and noxious fumes or pollutants which caused depreciation in the value of complainant's property, or which would affect an ordinary, reasonable person in average mental and physical condition. Fayco further denied that the operation of the plant would do irreparable damage to the complainant or to her property, or that the plant was negligently operated; and further alleged that it had expended large sums of money and employed many persons in and about the operation of its plant.

After a hearing the Chancellor, after making an extensive finding of facts, entered a decree denying all relief sought under the bill. From this decree the complainant perfected this appeal.

The evidence introduced below tends to show that the complainant and her husband owned a half-acre tract on the south side of Alabama Highway 18, some three or four miles west of Fayette, Alabama. They acquired this tract in 1955.

Across the highway on a leased tract of land a sand and gravel operation had been conducted for some time. The Luxapalila River constitutes the western boundary of both tracts.

In 1961, the complainant and her husband, now deceased constructed a combination home and store on their tract, as well as a barbeque stand or restaurant. There

was also a garage with tin sides and a pump house on the premises.

Fayco, Inc., or its predecessors, at one time operated an asphalt plant about a half mile distant which processed asphalt mix used in surfacing roads. The sand and gravel company was merged with Fayco, and thereafter in 1966, Fayco moved its asphalt plant onto the site across the road from complainant's premises.

The complainant testified that the operation of this asphalt plant caused the emission of thick black smoke and fumes all day. A greasy black film coated her house both inside and out, even getting into dresser drawers. Her shrubbery sickened. Upon touch, this film felt as though it had sand in it. There was an odor of asphalt. Within a month the complainant became sick from inhalation of the asphalt odor or fumes and moved to her mother's home about a quarter of a mile away. Prior to the operation of the asphalt plant, the complainant testified, she had never suffered from any allergic condition.

The complainant testified that when she left her home she let some people stay there to take care of the place and keep things from being stolen. It was developed on cross-examination, however, that the building comprising the residence and store had been rented almost continuously at a rental of $40.00 per month since the complainant moved out.

Complainant rented the barbecue stand to V. L. Hubbard but he closed it after about a year and a half and she has not made any effort to rent this building since then.

The complainant testified that she estimated the value of her premises to be $16,000.00 prior to the operation of the asphalt plant, and the value now was between $10,000.00 and $12,000.00. However, cross-examination of the complainant showed that the value of the premises prior to the operation of the plant was based on what some unnamed real estate dealer had told her.

Her local physician referred her to Dr. Robert H. Donald, a physician in Tuscaloosa, an ear, nose, and throat specialist, and also a specialist in allergic diseases.

By deposition Dr. Donald testified that he first saw the complainant in May 1967. His first examination revealed that the complainant's head and chest were congested, with some difficulty in breathing, which suggested an allergic condition. From complainant's history he surmised "that this was caused probably from, if I remember correctly, they were laying some asphalt in front of her house, or doing some kind of road work in front of her house." A coal tar distillate, along with dust, could cause this reaction.

Dr. Donald made skin patch tests with various substances the results of which showed a positive reaction to dog hair, cat hair, histamine, tobacco smoke, dust, and some grasses. No scratch test could be made to determine complainant's reaction to fumes from the asphalt. He found the complainant very sensitive to allergies. He was able to desensitize her to those substances on which he could test. However, there is no way to desensitize a patient who is allergic to fumes, and by a process of elimination, he concluded the complainant was allergic to the fumes from asphalt. Since she improved when she left her home, this supported his conclusions as to the asphalt fumes. The chemical fumes to which the complainant had been exposed definitely aggravated her condition.

Jerry Griffin lives about one fourth of a mile from the asphalt plant. For the complainant, he testified that he had worked at the asphalt plant for awhile, and the fumes did not make him sick. The smoke emitted by the plant was bad at times, though "the new sprinkler system has helped a lot but it has not stopped it."

Barbara Ann Hubbard and her husband moved to complainant's premises in July 1967. Mrs. Hubbard testified that smoke from the asphalt plant caused a greasy

film to adhere to the house and to everything in the house. Cleaning was useless, as the film would be back the next time the plant operated, which was virtually every week. They lived at the premises until May 1967. It appears, however, that as the Hubbard's moved out, her sister-in-law, Frances Hubbert, and her husband moved in. Frances Hubbert's testimony is to the same effect as Mrs. Hubbard's as to the effect of the smoke from the asphalt plant. At one time the Hubberts moved out for a short while to find a larger house, but again returned to complainant's premises and still reside there as tenants.

The respondent's evidence shows that for some years prior to complainant's occupation of her land, the Fayette Concrete Company operated a sand and gravel company on the site of the present asphalt plant. This company was a predecessor of Fayco, and its operation was to sell sand to the Independent Construction Company which operated an asphalt plant some three-fourths of a mile from the sand and gravel operation. Independent Construction Company was merged into Fayco. Before the merger, Independent Construction and Fayco were separate corporations.

When operated by Independent Construction Company, the asphalt plant was a Barber-Greene type. After acquisition of Independent Construction by Fayco, the asphalt plant was moved to its present site.

In processing the asphalt mixture used in road building, moist sand and gravel is hauled from the river. This material is fed into a dryer by a conveyor. A flame is then blown into the dryer by pumps which make a roar or hissing sound when operated.

An elevator carries the dried sand to a mixer where the sand is weighed and then mixed with raw asphalt. This mixing process requires 45 seconds. This finished mix, which has a temperature of 300 degrees, is then dumped in trucks and hauled to the highway construction site. The raw asphalt is stored in tanks. Throughout the process the materials are conveyed as to be unexposed.

It appears that when the Barber-Greene plant began operation on the new site in 1966, there was some complaint about the smoke emitted. Fayco had a washer designed and installed. By this devise the smoke from the dryer was pumped into a large tank where many nozzles sprayed water into the smoke to remove foreign matter, resulting in only clean air exiting from the washer tank.

According to the president, Fayco was the first asphalt plant to install such a device, though all asphalt plants now have such devices.

According to Fayco's plant foreman, this washer did "a good job," and he did not think any particles were emitted after its installation.

In 1967, the Barber-Greene plant was replaced by a new Simplicity plant and washer. According to respondent's evidence, this new plant is the best and most modern available. Its washer is larger and has more water spraying power. The respondent's foreman testified that the only emission from the new plant is steam.

Some 12 to 17 trucks are loaded daily at the plant. The area around the plant was paved in 1970, and a jeep sweeper is used to sweep the area and keep it clean.

Black smoke emits from the washer only if it breaks down. This has not happened often, and when it has occurred, the plant is closed down until repairs are made.

Several employees of Fayco testified that while there was an odor of asphalt around the plant, they had suffered no ill effects therefrom. They further testified that they had not noticed any black smoke, or particles, falling in the area and the only emission from the plant resembled steam which just blew away.

The president of Fayco testified that in its operation, local labor, local trucks were used, and raw materials were purchased

locally, and since May of 1966 through January 1971, the company has expended some $1,430,712.46 in this connection.

The evidence shows that subsequent to the time the asphalt plant began operation, Highway 18 was made into a four-lane highway, the new lane being constructed on complainant's side of the highway. Jessie Swanson, an engineer with the State Highway Department, testified that the front of complainant's house extends 1½ feet onto the right-of-way.

At the conclusion of the hearing, counsel for the respondent moved that the court view the plant.

Counsel for complainant objected, stating that the plant was not in operation. In reply to this objection, the court stated:

"The plant is not in operation so let me hold that over until they are. I think it should be done when the plant is in operation."

Section 1081, Title 7, Code of Alabama 1940, defines a nuisance as follows:

"A nuisance is anything that worketh hurt, inconvenience, or damage to another; and the fact that the act done may otherwise be lawful does not keep it from being a nuisance. The inconvenience complained of must not be fanciful, or such as would affect only one of a fastidious taste, but it should be such as would affect an ordinary reasonable man."

In Section 1084, Title 7, Code, it is declared, among other things that:

"A private nuisance is one limited in its injurious effects to one or a few individuals."

Fayco's business was lawful, and was not a nuisance per se. However, a lawful business may become a nuisance when improperly maintained. Nevins v. McGavock, 214 Ala. 93, 106 So. 597.

Since the rendering of the opinion in the oft-cited case of Clifton Iron Co. v. Dye, 87 Ala. 468, 6 So. 192, this court has given recognition to the comparative injury rule in considering whether a lawful business should be enjoined as a nuisance. As stated in Clifton Iron Co., supra, "the court should weigh the injury that may accrue to the one or the other party, and also to the public, by granting or refusing the injunction." This pertinent principle is but a recognition of the discretion resting in a court of equity in granting or refusing injunctive relief. Pritchett v. Wade, 261 Ala. 156, 73 So.2d 533. To this same effect see also Martin Bldg. Co. v. Imperial Laundry Co., 220 Ala. 90, 124 So. 82; Brown v. Allied Steel Products Corp., 273 Ala. 184, 136 So.2d 923.

A pertinent observation as to the principles governing in a case such as the present, i. e., the granting or refusing of relief, is to be found in Rouse v. Martin, 75 Ala. 510, as follows:

"* * * while occasionally a court has undertaken to lay down very specific rules for their government and determination, the better view is that only general principles can be declared, and that each case must be determined upon its own facts in the light of those general principles."

In the opening paragraph of its decree, the court stated that the case was submitted for final decree "upon the bill of complaint as last amended, respondents' amended answer and testimony and exhibits as noted by the Register in the note of testimony; and the court having visited the plant and observed its operation." The court then made a finding of facts, which included among other findings, the following: (1) that a sand and gravel business had operated on the tract on which the respondent placed the asphalt plant for years prior to the acquisition of the complainant to the tract of land for which complainant's buildings were erected, (2) that the front wall of complainant's house is located over on the right-of-way of Highway 18, a four lane highway on which there is much traffic with its attending noise and

emissions, (3) that the asphalt plant is not negligently or improperly operated, (4) that the odors or smoke emitted from the plant are not excessive or unusual and are such as would not affect an ordinary reasonable person, (5) that the complainant is highly sensitive to many things, including, but not limited to asphalt odors, and in this sense should not be considered an ordinary person, (6) that it would do irreparable injury to the respondent to enjoin the operation of the plant, and weighing any injury that has or may accrue to the respondent, its employees and suppliers, and persons who desire to purchase asphalt, the injunction should not be granted, and (7) the complainant is not entitled to the relief prayed for in her bill.

The Chancellor then decreed that the relief prayed for should not be granted.

It is apparent that the prayer for an injunction was denied not only on the basis of comparative injury, but also on the basis that the Chancellor concluded after hearing all the evidence, and visiting the plant, that the operation of the plant did not constitute a nuisance.

■ As usual, we are here presented with a finding of fact made by a trier of fact upon evidence in sharp contradiction. The presumption of correctness to be accorded such finding has been so often repeated as to dispense with citation of authority. This presumption is strengthened where the trier of facts visits the premises involved before making findings of fact. Welch v. Lee, 265 Ala. 594, 93 So.2d 427; Barnett v. Millis, 286 Ala. 681, 246 So.2d 78. This for the reason that this court under such circumstances does not have before it all the evidence that may have influenced the lower court in its conclusions. Fuller v. Blackwell, 246 Ala. 476, 21 So.2d 617.

■ We do observe that it is the better practice for a trial judge, sitting as a trier of fact, in exercising his discretion to visit the locus in quo, to do so in the presence of the parties, or with notice and opportunity for them to be present. However, if a trial judge sitting as a trier of fact, visits the locus in quo without notice to the parties, such action does not afford a ground for a reversal. In such case, this court will assume that the judge observed all the safeguards he would throw about a jury in making such inspection. Adalex Construction Co. v. Atkins, 214 Ala. 53, 106 So. 338; Mutual Service Funeral Homes v. Fehler, 257 Ala. 354, 58 So.2d 770.

In his brief counsel for complainant states:

"Furthermore, the equity of this bill of complaint having been established, the Court, in the light of the denial of the injunction, should have awarded damages. See Mobile County v. Barnes-Creary Supply Co., 225 Ala. 127, 142 So. 72."

■ The fallacy of this argument is that after a full hearing the Chancellor concluded that under the evidence there was no basis for awarding equitable relief to the complainant.

In Yauger v. Taylor, 218 Ala. 235, 118 So. 271, the principle governing in such circumstance is set forth as follows:

"The rule is general and well recognized that when an equitable cause is presented, the court will, after granting the equitable relief, proceed to do complete equity, and to that end grant incidental relief which may be awarded at law. But the rule is likewise as firmly settled that if the equitable relief sought is denied, the court cannot retain jurisdiction and grant relief available at law. There must be equitable relief as a basis for supplemental relief."

■ After a study of this record, it is our conclusion that there was sufficient evidence, if believed to the required degree, to support the decree rendered. Under the rules governing our review, we find no basis that would justify our saying

that the Chancellor, who saw the witnesses and heard them testify, and who viewed the premises, was palpably wrong in his conclusions.

Affirmed.

MERRILL, MADDOX, and FAULKNER, JJ., concur.

HEFLIN, C. J., concurs specially.

HEFLIN, Chief Justice (concurring specially):

I concur with the holding reached by my colleagues but feel it is necessary to add one final comment, with which all participating justices are in accord, lest a portion of the court's opinion be misinterpreted.

The latter part of the opinion contains a quote from Yauger v. Taylor, 218 Ala. 235, 118 So. 271 (1928) to the effect that equity will not grant legal relief in the absence of a decree awarding some form of equitable relief. This is mentioned in regard to the appellant-complainant's claim for money damages, and I do not take issue with this statement of law; however, I think it is unnecessary to the holding and lends itself to misinterpretation.

The affirming opinion of this court in the case under review interprets the lower court's final decree as finding that there was no nuisance. Thus the appellant-complainant would be entitled to no damages either at law or in equity. Therefore, the quote from Yauger v. Taylor, supra, has no application to this case.

Assuming, on the other hand, that there was a nuisance but that a proper balancing of the equities dictated that it not be abated, then the appellant-complainant would, even in the absence of an injunction-granting decree, have an equitable cause of action for the alleged permanent and constantly recurring injury to his land, as the legal remedies for this type of futuristic injury do not afford adequate or complete relief. McCary v. McLendon, 195 Ala. 497, 70 So. 715 (1915); City of Clanton v.

Johnson, 245 Ala. 470, 17 So.2d 669 (1944). Of course, the latter situation, i. e., unabateable nuisance, is not applicable since the lower court's decree has been interpreted as finding that there was no nuisance and, therefore, the equitable remedy for futuristic money damages was not available to the appellant-complainant. However, the rule reaffirmed in the court's opinion, i. e., equity will not grant legal relief in the absence of a decree awarding some form of equitable relief, should not be understood as precluding an action in equity for futuristic damages under the conditions mentioned above, even in the absence of a decree awarding an injunction, as such damages themselves constitute equitable relief.