# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 7, 2003 Session

## ERNEST TARPLEY, ET AL. V. BERT M. HORNYAK, ET AL.

**Appeal from the Chancery Court for Wilson County**
**No. 00379     Charles K. Smith, Chancellor**

---

**No. M2002-01466-COA-R3-CV - Filed March 15, 2004**

---

Landowners sued to abate a nuisance claiming that a concrete causeway, built over a creek by an adjoining landowner, caused water to flood their property. After hearing from one witness, the trial judge discouraged further proof and instead chose to visit the plaintiffs' land at the next flooding. He subsequently found the causeway to be a nuisance and ordered it removed. We reverse because trial court based its decision solely on the basis of the judge's personal observations.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., and WILLIAM B. CAIN, J.J., joined.

Justin D. Pitt, Lebanon, Tennessee, for the appellants, Bert M. Hornyak and wife, Dorothy E. Hornyak.

Henry Clay Barry, Lebanon, Tennessee, for the appellees, Ernest Tarpley and wife, Mary Nell Tarpley.

### OPINION

### I. THE FACTS

This dispute involves a structure variously described in the pleadings as a bridge, a concrete causeway, and a crossover, built by Wilson County landowners Bert and Dorothy Hornyak. Their upstream neighbors, Ernest and Mary Nell Tarpley, claimed that the drainage culverts under the structure were inadequate to carry the volume of water flowing down the creek in wet and rainy times, causing the Tarpleys' fields to flood and become marshy and uncultivable.

The Tarpleys filed a Complaint to Abate Nuisance in the Chancery Court of Wilson County alleging that because of its faulty construction, the bridge essentially functioned as a dam for creek

waters. The plaintiffs asked the court to order the structure removed, to order the Hornyaks to remove rocks and materials they allegedly deposited on the Tarpleys' land during the construction of the causeway, and to award them a judgment of up to $10,000 for the damages they allegedly suffered because of flooding.

The Hornyaks filed an Answer, admitting they had constructed a concrete bridge, but denying that they had created a nuisance or that they had deposited materials on the plaintiffs' land. In an amended answer, they alleged that they had merely resurfaced a long-existing crossover.

A trial was begun. The record does not contain a transcript of the trial, or of any other proceedings in this case, except for a one-page transcript of the hearing on the Motion for New Trial. Thus, the only evidence in the record of what went on during any other proceedings are two Statements of the Evidence filed by the parties. Neither Statement of the Evidence was explicitly approved by the trial court, *see* Tenn. R. App. P. 24(e), but they complement rather than contradict each other and are consistent with the trial court's written orders. The following account is derived from both statements.

The attorneys for both parties presented their opening statements, after which Ernest Tarpley was called to the stand. He testified on direct that the causeway caused flooding on his property during times of heavy rain, and that his hay crop had been damaged by the flooding. On cross-examination, the Hornyaks' attorney asked Mr. Tarpley what evidence existed to prove his alleged damages, other than his own testimony. During this line of questioning, the chancellor interrupted, telling the attorneys he wanted them in his chambers. He then ordered a recess.

According to the plaintiffs' Statement of the Evidence only (the defendants' statement concluded with the declaration of the recess), the judge announced in chambers that he would be happy for the parties to put on all the proof they wanted, but that from their opening statements, it appeared they were going to testify in direct contradiction to each other on the question of whether the bridge caused flooding. The judge reasoned that a continuance of the case would not cause either party any harm, and declared that he did not want to make a decision until he or the Clerk and Master had the opportunity to witness the flooding in person. He accordingly instructed the plaintiffs' attorney to contact the Clerk and Master when and if flooding occurred again, at which time one of them would proceed to the site. The court's ruling was memorialized in a July 5, 2001 order, which states:

> It appears that the Court is not in a position to determine the validity of the Complaint filed herein. The Court must determine whether or not the nuisance complained of, to wit, that water flows over the bank onto Plaintiff's property as a result of a certain crossover constructed by Defendant.

> Therefore, this Court reserves judgment until sufficient proof has been offered by the Plaintiff. Therefore, this matter shall be and is hereby continued until the Court or the Clerk and Master has an opportunity to witness the flow of water.

-2-

All other matters are reserved.

Eight months after the trial began, the Tarpleys reported an incident of flooding following heavy rains the night before. Their attorney notified the Clerk and Master of the flooding. After conferring with the Chancellor, the Clerk and Master called the attorneys for both parties, and announced that the Chancellor was going to witness the event, with both parties and their attorneys welcome to attend. At the time, the Hornyaks were in Florida. Their attorney stated that he had a conflict and would be unable to appear, but he had no objection to the matter proceeding without him. He also notified Dee Hutchison, the Hornyak's adult daughter.

The Clerk and Master and the Chancellor drove to the site, as did the Tarpleys' attorney. Ernest Tarpley and Dee Hutchison were also present. The Chancellor spent about half an hour viewing the creek and the flooding which was occurring in the fields adjoining the creek. According to the affidavit of Dee Hutchison, the Chancellor also talked to Ernest Tarpley and his attorney about the flow of water on the property. The Chancellor then returned to the Wilson County Courthouse.

The Chancellor subsequently placed a three-way call between himself and the two attorneys, in which he announced his judgment. He said that he saw the water backed up by the obstruction, and that as a result the plaintiffs' fields were being flooded, with the flooding extending into the fields of the defendants as well. He declared that the bridge was a nuisance, ordered its removal, and stated that he would hold all other matters in abeyance pending a party setting a hearing on the issue of damages and attorney fees. The court's subsequently entered written judgment stated:

> Both parties appeared in person and represented by counsel, whereupon it appeared to the Court that the issue in this common law nuisance suit was whether or not the concrete bridge with culverts, which the Defendants had built across a stream caused their neighbors, the Plaintiffs, who own the property immediately upstream from the bridge, to flood, if so, the bridge represents a nuisance. If not, then it does not. The Plaintiff testified that the bridge caused his property to flood and the Defendant denied the same. Therefore, the Court reasoned that it should continue the case, until the next substantial rain, so that this Court or the Clerk and Master could have an opportunity to witness the flow of the water, and determine whether or not the same flooded the Plaintiffs property.
>
> Thereafter, the Court received a phone call asking it to come and view the stream. The Court traveled to Statesville and viewed the stream, whereupon it appeared to the Court that the bridge did in fact, back up the waters and caused the Plaintiffs', as well as the Defendants', property to flood. It therefore appeared to the Court that the bridge did, in fact, represent a common law nuisance.

The defendants filed a Motion for New Trial, which was heard on May 9, 2002. The one page-transcript shows that the Hornyaks' new attorney objected to the fact that neither the defendants nor their attorney were present during the viewing of the creek, that there were private

communications between the judge and the plaintiff at that time, and that the Hornyaks were not given the opportunity to present a defense. The trial court denied the motion for a new trial. This appeal followed.

## II. ISSUE ON APPEAL

The standard of review on appeal is well-settled. We review the trial court's findings *de novo,* with a presumption of the correctness of the factual findings of the trial court, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001).

The trial court found, after its view or inspection of the property, "it appeared to the court that the bridge did in fact back up the waters and caused the . . . property to flood." The record clearly shows that the trial court reached its conclusions on the basis of its personal observation of the property.[1] Because it is impossible for us to review what the trial judge saw, this court cannot perform its duty to review any facts gleaned during the view and any findings based thereon under Tenn. R. App. P. 13.

In most situations, the inadequacy of an appellate record will be attributed to the appellant, whose responsibility it is to prepare a record that is adequate for a meaningful appellate review. Tenn. R. App. P. 24(b); *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); *McDonald v. Onoh*, 772 S.W.2d 913, 914 (Tenn. Ct. App. 1989). The result is generally that where factual issues are raised, without an appellate record containing the facts, this court cannot perform a *de novo* review or determine the preponderance of the evidence. *Sherrod v. Wix*, 849 S.W.2d 780, 783 (Tenn. Ct. App. 1992). Therefore, in such cases, we usually assume that the record, had it been preserved, would have contained sufficient evidence to support the trial court's factual findings. *Id*.; *McDonald*, 772 S.W.2d at 914; *Gotten v. Gotten*, 748 S.W.2d 430, 432 (Tenn. Ct. App. 1988); *Irvin v. City of Clarksville*, 767 S.W.2d 649, 653 (Tenn. Ct. App. 1987).

However, the general rule should not be applied in this case for a number of reasons. First, although the Hornyaks consented to the judge viewing the property, they did not affirmatively waive their right to put on evidence. Consequently, we will not attribute the inadequacy of the record to them. Second, the issues raised by the Hornyaks on appeal are not direct challenges to the sufficiency of the evidence; they are instead challenges to the procedures used in the view and the use of the judge's observations to the exclusion of other evidence. Third, we think the real issue in

---

[1] As to other evidence in the record, Mr. Tarpley testified that the crossway caused flooding on his property during times of heavy rain and that his hay crop had been damaged by the flooding. Cross examination of this witness was apparently cut short by the court's decision to talk to the lawyers in chambers. The record also includes a collection of 19 photographs of a bridge, shown both in wet weather and in dry. A notation on the back of the last photo identifies the collection as exhibit 1 to the testimony of Ernest Tarpley. The Certificate of Appellate Record indicates that the exhibit was either "authenticated by trial judge or as provided by T.R.A.P. Rule 24(f)." There is nothing in the record to indicate that Mr. Tarpley was ever questioned about them and, consequently, no identification of the photographs or description of what they depict.

this case is whether a trial court, sitting without a jury, can base its judgment solely on personal observations made during a view or inspection of the *locus in quo*. This is a question of law, which we review *de novo*. *See American Family Mutual Insurance Company v. Shannon*, 356 N.W.2d 175, 177-78 (Wis. 1984).

## III. THE "VIEW" BY THE JUDGE

As far as we can tell, the issues created by the court's view in the case before us, including the problem of effective or meaningful appellate review, have not been addressed in Tennessee.[2] They have, however, been the subject of opinions elsewhere. Jurisdictions vary in how they treat judge or jury views. They are split as to whether the information gathered on an inspection is actually considered evidence or merely an aid to understanding evidence presented in court, but less divided on the related issue of the extent to which information gained in an inspection or view can be used in reaching the ultimate decision in a case.

## A. ARE THE THINGS OBSERVED EVIDENCE?

Some courts have found that the information obtained in a view or visual inspection of the site is evidence. *See, e.g., Beneduci v. Valadares*, 812 A.2d 41, 47 (Conn. App. 2002) (holding that information obtained in a visual inspection is "just as much evidence as any other evidence in a case"); *State v. Pauline*, 60 P.3d 306 (Haw. 2002) (holding that a jury view has status of independent evidence and does not serve merely to illustrate testimony). Where that rule prevails, a few courts have gone so far as to hold that conclusions by a trial judge based on evidence obtained in a visual inspection are "entitled to great weight on appeal . . . and are subject to review only for clear error." *Beneduci,* 812 A.2d at 47.

Although federal courts have seldom considered the issue, *see EEOC v. Mercy Hosp. & Medical Ctr.*, 709 F.2d 1195, 1199 (7th Cir. 1983) (noting there is "surprisingly little" federal court authority regarding the conduct of a view by the trial court in a bench trial), the United States Supreme Court expressed its view on the subject stating:

> We find it of no moment that the judge in this case described the view as evidence. The Supreme Judicial Court of Massachusetts has said of a view that 'its chief purpose is to enable the jury to understand better the testimony which has or may be introduced' . . . even so, its inevitable effect is that of evidence, no matter what label the judge may choose to give it.

*Snyder v. Massachusetts*, 291 U.S. 97, 121, 54 S. Ct. 330, 338, 78 L. Ed. 674 (1934), *overruled on other grounds*, *Malloy v. Hogan*, 378 U.S.1, 84 S. Ct. 1489, 12 L. Ed.2d 653 (1964).

---

[2]The Court of Criminal Appeals has examined whether the procedures used in transporting a jury to the scene of the crime prejudiced the defendant. *State v. Remus*, No. W1999-01448-CCA-R3-CD, 2000 WL 279911 (Tenn. Crim. App. March 8, 2000) (no Tenn. R. App. P. 11 application filed).

In *Lillie v. United States*, 953 F.2d 1188 (10th Cir. 1992), the Court of Appeals for the Tenth Circuit acknowledged that jurisdictions varied as to whether a view is evidence or simply an aid to understanding evidence otherwise in the record, and stated that such a distinction is "only semantic, because any kind of presentation to the jury or the judge to help the fact finder determine what the truth is and assimilate and understand the evidence is itself evidence." *Id.* at 1190.

Wigmore takes the position that observations made by the fact finder, whether judge or jury, obtained by inspection in the courtroom or on a view to the site are evidence. The object or site viewed is "real evidence," as compared with testimonial and circumstantial evidence. 4 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW §1150 (James H. Chadbourn rev. 1972). Where the object in question, or the real evidence, cannot be brought into court, it is appropriate for the fact finder to go to the object and observe it there. *Id*. §§ 1162 and 1169. This process of a "view" has long been used, and generally lies within the discretion of the trial court. *Id*. §§ 1162 and 1164. Wigmore dismissed the theory that a fact finder's view does not involve the obtaining of evidence. *Id*. § 1168.

However, it must be noted that Wigmore's discussion of real evidence in this context was limited to those matters that can be directly perceived and do not require that any inference be drawn from the evidence.[3] "This source differs from the other two in omitting any step of conscious inference or reasoning, and in proceeding by direct self-perception, or autopsy." *Id*. § 1150. Consequently, Wigmore described presentation of the thing itself that proved a proposition as "autoptic proference." *Id*.

Therefore, any consideration of observations at a view of the *locus in quo*, and their status as evidence, must include consideration of the facts that can be discerned by physical inspection versus those that can only be inferred from the observations. In the case before us, the only fact that was provable by the view was that the property was flooded on the day of the view. That flooding did not directly prove that the property had flooded at other times and certainly did not prove causation. The trial court's conclusions on those issues could only have been the result of inferences

---

[3]In his well-known example of this kind of evidence, Wigmore explains that if the question is whether the accused has lost his right hand and wears an iron hook in its place, the testimony of a witness could be the source of a belief on the issue, as could a mark left on an object grasped by the accused. The third source of belief is simply an inspection of the accused's arm by the fact finder. *Id*. The following passage explains:

> There are indeed genuine cases of inference by the tribunal from things perceived to other things unperceived - as, for example, from a person's size, complexion, and features, to his age; these cases of a real use of inference can be later more fully distinguished. But we are here concerned with nothing more than matters directly perceived - for example, that a person is of small height or is of dark complexion; as to such matters, the perception by the tribunal that the person *is* small or large, or that he *has* a dark or a light complexion, is a mode of acquiring belief which is independent of inference from either testimonial or circumstantial evidence. It is the tribunal's self-perception, or autopsy, of the thing itself.

*Id*. §1150.

the judge made based on his view. When used as the basis for inferences, observations lose their nature as autoptic proference. Consequently, reliance on Wigmore for the proposition that observations or views are real evidence is misplaced without examination of what the view could directly prove.

In many jurisdictions, we think a majority, the rule has developed that a judge's or juror's personal observations of the site are not considered evidence of facts. *See Tid Bit Alley, Inc. v. Erie County*, 520 A.2d 70, 76 (Pa. Cmwlth. Ct. 1986) (reaffirming that "a view cannot replace testimony and the visual observations of the trier of fact cannot be substituted for testimony"). In *McDowell v. Schuette*, 610 S.W.2d 29, 40 (Mo. Ct. App. 1980), the reviewing court found unpersuasive the appellants' arguments that exclusion of counsel and court reporter prevented objection to and preservation of evidence at the view and that the jury view improperly allowed lay opinion on matters requiring expert testimony. The reason the court rejected these arguments was because the jury view was not evidence since a view was proper only for the purpose of helping the fact finder understand the evidence and a view cannot constitute evidence in a case.

This approach is exemplified by the statement that the "only legitimate purpose of an inspection is to illustrate the evidence and provide a base for understanding and comprehending testimony upon the record." *Tid Bit Alley,* 520 A.2d at 76, quoting *Cowan v. Bunting Glider Co.*, 49 A.2d 270, 271 (Pa. Super. 1946). *See also Gilbert v. City of Caldwell,* 732 P.2d 355, 367 (Idaho App. 1987) (stating that although the subject of debate, generally a view is not characterized as evidence because unlike real, testimonial, and documentary evidence, it cannot be included in the record).

It appears to us that the preferred rule that has developed regarding views or inspections of a location involved in a lawsuit[4] is that stated in 89 C.J.S. *Trial* § 1036 (2000):

> While personal inspections of property are permissible and proper as an aid to a better understanding by the judge of the evidence, the issues, what the witnesses have testified to, the weight of the evidence, and its proper application, such views are limited to that purpose and the judge's personal observations of the site are not considered evidence of facts.

A number of courts have followed this rule. For example, in *Russell v. Dart,* 139 So.2d 770 (La. App. 1961), the plaintiff homeowner sought a remedy for the faulty installation of a new roof. The roofing company claimed the installation of the roof was proper. Expert witnesses testified for both sides, but the testimony of the plaintiff's experts was in "irreconcilable conflict" with the testimony of the four experts for the defendant. Since the plaintiff's experts said the defects in the roof could be discerned by visible inspection, and that a layman could observe their existence, the

---

[4]Most states and the federal government provide for juries of view in eminent domain and similar cases. *See, e.g.*, Tenn. Code Ann. §§ 29-16-101 *et seq*., 29-17-101 *et seq*, and 54-14-101 *et seq*. Those statutory procedures are separate from and not included in the general rule on views.

trial judge decided he had to go to the house and inspect the roof himself, after which he rendered a judgment for the plaintiff. The appeals court affirmed, stating that

> "[a] trial judge has a perfect right in a proper case such as this to take into consideration his ocular observations made outside the courtroom . . . not for the purpose of supplying new evidence, but with the hope of determining, where the evidence is conflicting, just what testimony in the record is worthy of belief.

*Id*. at 775.

As referenced earlier, in *Tid Bit Alley*, the court considered a judge's decision to make his own observations of an alleged nuisance and stated:

> Triers of fact, be they judges, jurors, viewers, board or commissions, may always visit and inspect the locus in quo to secure a better understanding of the evidence and to enable them to determine the relative weight of conflicting testimony. But a view cannot replace testimony; the visual observations of the trier cannot be substituted for testimony; and the only legitimate purpose of an inspection is to illustrate the evidence and provide a base for understanding and comprehending testimony upon the record.

520 A.2d at 76, quoting *Cowan v. Bunting Glider Co.*,159 Pa. Superior Ct. 573, 575-76, 49 A.2d 270, 271 (1946).

We tend to agree with the *Lillie* court's observation that the question of whether a view is considered as evidence or as an aid to understanding evidence is largely one of semantics. The cases and principles discussed above demonstrate that, although some courts have described observations from a view as not constituting evidence, courts have been more concerned with the purpose of the view, *i.e.*, not to obtain new or independent evidence. Thus, courts stating observations from a view are not evidence are often actually stating that such observations cannot be used as evidence or as competent evidence. In other words, because a view cannot be properly used to gather new evidence, appellate courts will not consider observations from a view in their review of the evidence. Thus, the important question is what use a judge can make of information gathered at a view.

## B. RELIANCE ON OBSERVATIONS FOR RULING

There are numerous other cases which affirm the right of a judge to make an out-of-court site visit for a better understanding of testimony and evidence presented in court, but not for the purpose of creating new evidence. These cases vary a little in their statement of the rule limiting the purpose of a view or inspection by the trial court. *See, e.g.*, *Clinton National Bank v. City of Camanche*, 251 N.W.2d 248, 251 (Iowa 1977) (holding that while a judge has a right to view premises for a better understanding of the testimony, the appellate court could not consider the judge's observations as

evidence); *Scroggins v. Solchaga,* 552 N.W.2d 248, 252 (Minn. App. 1996) (holding that a factfinder may not gather its own evidence on a view). However, they are essentially uniform in precluding the use of observations made in such a view as the basis for the judgment.

In *Cox v. Moore,* 805 So.2d 277 (La. App. 2001), the trial judge visited the scene of a motor vehicle accident, and the reviewing court held that it was permissible for a trial judge to make such a visit, not for the purpose of gathering new evidence, but for determining "when the evidence regarding such site is in hopeless conflict, which version is worthy of belief." *Id*. at 281. After reviewing the trial court's reasons for its judgment, the appellate court concluded that the judge had not "create[d] additional evidence." *Id*. The parties had introduced pictures of the site and established the layout of the site through testimony. Consequently, the court found no abuse of discretion because the "visit to the site did nothing more than establish a clearer picture in his mind of what was already in evidence and help him decide between the directly conflicting opinions of the expert witnesses." *Id.*

Similarly, in *American Family Mutual Ins.*, the court considered a view by a judge by referring to a statute about jury views. As in a jury view, a view by a judge is justified if it enables the judge to better understand, correctly weigh, and assess the respective credibility of the evidence. However, the court held:

> A view and the facts or information thereby derived must not be considered as evidence independent of that produced in the course of the trial. The correct purpose of the view is to aid the judge to better understand and weigh the evidence, not to obtain new evidence or to independently determine credibility. The judge should consider the sufficiency of the other evidence and the availability of alternatives to viewing the scene.

356 N.W.2d at 179.

In *Belmont Nursing Home v. Illinois Dept. of Public Aid,* 439 N.E.2d 511 (Ill. App. 1982), the trial judge visited a nursing home involved in an administrative decision not to renew the facility's Medicaid certification and a request for a temporary restraining order staying the enforcement of that decision. The judge viewed the facility and talked to the residents, asking them if they wanted to leave and how they were being treated. The appellate court reiterated the rule that facts gained from a judge's personal observations during a view cannot be considered in evidence. Because the stay order entered by the trial judge was clearly the product of his observations and investigation, the appellate court found that the decision was based on other than competent evidence and required reversal. *Id*. at 514.

As these cases make clear, the rule that a view is only proper to help understand or reconcile other evidence necessarily implies the existence of such other evidence. Regardless of whether it is more proper to characterize the observations made at a view as evidence, or as an aid to understanding the evidence, we believe that it is the degree to which the fact finder relies on

observations made during the view, as compared with evidence appearing in the record, that is the basis for the rulings and principles that have developed on the issue.[5]

A view of the site may not supply a want of evidence or serve as the basis of a verdict. *Gilbert*, 732 P.2d at 367. A constituent fact may not be determined by a view of the premises alone. *Adams v. Lindberg*, 610 P.2d 75, 76 (Ariz. App. 1980). And, a trial court may not conduct a view of the site to obtain extrinsic evidence not included in the record. *O'Sullivan v. Scott,* 607 P.2d 1246, 1247 (Wash. App. 1980).

A number of courts have held that where a trial court bases its judgment on facts acquired from a view of the *locus in quo* as well as facts proved by evidence introduced at trial, that judgment must be reversed unless there is other evidence of record sufficient to support the judgment. *See Hammond v. Carlyon*, 96 So. 2d 219, 222 (Fla. 1957); *Atlantic Coast Line R. Co. v. Hendry*, 150 So. 598 (Fla. 1933); *Russell v. Bartlett*, 139 So 2d 770, 774 (La. App. 1961) (recognizing the general rule that although a judge may not formulate an opinion based solely on a personal view of the *locus in quo*, and that a judgment based on a view that is contrary to the evidence in the record would be reversed, but holding that a judge may inspect a location and take those observations into consideration for the purpose of determining what testimony in the record is worthy of belief).[6] *See also Eisenbrandt v. Finnegan*, 509 N.E.2d 1037, 1039 (Ill. App. 1987), (holding that because the judge used the view to help understand items already admitted into evidence, in a case where the issue in dispute was flooding of the plaintiff's land which was allegedly caused by construction activity of an adjoining landowner, and because the record stated that photographs already admitted in evidence were the basis of the trial court's ruling, the trial court did not improperly consider its observations at the view).

The venerable lineage of this rule is demonstrated by the case of *First National Bank of Clifton v. Clifton Armory Co. et. al.,* 128 P. 810 (Ariz. 1912). In dealing with the question of

---

[5]In addition, even where observations are considered as providing evidence, the conditions observed can only constitute real evidence where they prove a fact without the necessity of further inference. Thus, the trial court's use of its observations to support a finding must be tested by whether the matter at issue is provable solely by the physical object or locality.

[6]There are holdings that are somewhat inconsistent. In *South Santa Clara Valley Water Conservation District v. Johnson et al,* 41 Cal.Rptr. 846 (Cal.App.2d 1964), the trial judge viewed the site where defendant allegedly impounded water in derogation of plaintiff's right to collect that water behind its own dam. The reviewing court in that case declared that when the view of the trial judge is with the consent of the parties, his observations are of "equal dignity" with the other evidence in the case, and can support a judgment even when all that other evidence indicates an opposite result. *Id*. at 853. Interestingly, however, the court distinguished those matters that can be decided by a layman (the judge) as opposed to those requiring expert testimony. The court stated, "in the present case the physical criteria for finding the existence or nonexistence of a watercourse-namely, channel, bed and sides or banks-were clearly visible to the judge at the time of his visit." *Id*. at 853. *See also Fowler v. Fayco,* 275 So.2d 665 (Ala. 1973) (holding that where a fact finder is presented with sharply contradicting evidence and takes a view of the site, the appellate court cannot reverse because it does not have before it all the evidence that may have influenced the trial court). In both cases, however, there was evidence in the record separate from the judge's view.

whether a particular building should be considered a temporary structure or a fixture for mortgage purposes, the trial judge declared that he had personally viewed the premises, and that he had taken his observations into consideration in determining the outcome. The Arizona Supreme Court reversed. Critical to this reversal was the fact that the trial court decided the building was a fixture "solely by autoptic inspection." *Id*. at 812.

Assuming that the trial judge had discretion to make a view of the property in order to clear up the evidence otherwise presented to the court, the Arizona Supreme Court was not prepared to hold that the case could be determined by the view alone. The Court stated, "[t]hat a presiding judge cannot give judgment on his personal and privage (sic) knowledge is a doctrine as old as Chief Justice Gascoigne, and has at all times been regarded as good law."[7] The court also found that legal questions involved in the case, *e.g.*, the relationship between the parties claiming ownership, could not be determined by a mere view of the property. We think both these principles are relevant to the trial court's ruling in the case before us.

These cases and others which limit the use a judge may make of his or her observations are based, in part, on the principle that a judge cannot be a witness in a cause which is on trial before him or her. *See* Tenn. R. Evid. 605. The relationship between reliance on personal observations, as opposed to evidence preserved in the record, and the various iterations of the rules regarding views of a *locus in quo* is explained in several cases. These cases deal with an improper view, that is one taken without consent or notice to the parties or the opportunity to be present, and with extrajudicial investigations by the judge. Thus, they differ in important respects from the case before us. Nonetheless, they are instructive in understanding the problems caused when a judge conducts a view and relies on his or her observations to resolve the case.

In *Price Bros. v. Philadelphia Gear Corp.*, 649 F.2d 416 (6th Cir. 1980), the trial judge sent his law clerk to observe the operation of a machine at the center of the lawsuit.[8] The appellate court held that a trial judge presiding in a bench trial may not, directly or indirectly, conduct an investigation outside the record and use the results of that investigation in determining the facts of a case. *Id*. at 419. This principle is based on the fairness requirement that facts be determined only upon the evidence properly presented on the record as well as the court's duty to protect both the fact and appearance of impartiality. *Id*.

The court noted that it had earlier remanded for a hearing on the law clerk's observation and report to the judge including "most importantly, what use the trial judge made in deciding the case of whatever the law clerk had observed." *Id*. at 420. The court concluded that the purpose of the

---

[7] The justice mentioned here is undoubtedly Sir William Gascoigne, (c. 1350-1419), who was Chief Justice of England during the reign of King Henry IV. He was known for courageous advocacy of the principle that even the head of state is subject to law, and is considered to be the inspiration for the character of the Chief Justice in Shakespeare's *Henry IV, Part II*.

[8] The defendant asserted it had not had prior notice of the clerk's trip to observe the machine, had no opportunity to be present at the viewing, and had no opportunity to review or rebut the clerk's report to the judge.

law clerk's observation was to describe it to the judge so that the judge might be better able to understand the evidence produced at trial and also held there was no indication that the trial judge considered the law clerk's report as evidence. Because the trial court's factual findings were not based on the off-the-record clerk's inspection, the court held that the improper view did not result in prejudice. *Id*. at 420-21.

Although the court in *Price Bros.* was dealing with an improper inspection, and the parties in the case before us were given notice of the judge's view and the opportunity to attend, the court's comments in *Price Bros*. regarding views are relevant to the issues raised in the case before us. The court stated:

> A view by the fact finder of places or objects related to a lawsuit does not per se destroy the fact finder's impartiality. Where the purpose of a view is to assist the fact finder to better understand evidence properly introduced, and the view itself is not considered as evidence, then the potential for prejudice to a party not present at the view is minimized. In contrast, where the fact finder's observations upon a view are used as evidence to determine the facts, then the procedural safeguards of a trial, including the rules of evidence and the participation of the parties must apply.

*Id*. at 419.

Similarly, the primary issues in *Lillie*, *supra*, were whether a trial court judge committed error when, without providing counsel the opportunity to attend, he visited the scene where the plaintiff tripped down steps and fell and, if it was error, did that conduct require reversal. The court recognized that most authorities agreed that it is error for a judge to take a view without providing an opportunity for counsel to attend. *Lillie*, 953 F.2d at 1190. After a thorough analysis of cases dealing with the effect of such error, the court determined that: (1) in cases affirming the trial court, the appellate court had found no indication that the trial court relied on the view in making its factual determination; and (2) in cases where the trial court was reversed, the appeal court had generally found that the trial court's findings did rely on the improper view.[9] After noting potential problems that may result when counsel is excluded from a view, the court went on to discuss a fundamental problem:

> When a judge engages in off-the-record fact gathering, he essentially becomes a witness in the case. The presiding judge "may not testify in that trial as a witness." Fed. R. Evid. 605. Thus, when an improper view is taken the evidence obtained is admitted in contravention of the Federal Rules of Evidence. *See also* Fed. R. Civ. P. 43 (testimony "shall be taken orally in open court, unless otherwise provided").

_____

[9]The *Lillie* court concluded that the trial court had relied on its improper view for at least one finding. Because the court considered the trial judge's observations during his inspection to be evidence, which was improperly admitted because the view was improper, it applied the general rule that erroneous admission of evidence is harmless only if other competent evidence is sufficiently strong to permit the conclusion that the improper evidence had no effect on the decision. Because the court could not make that determination, it reversed the trial court. *Id*. at 1192.

When there is an improper view the parties have no opportunity to cross-examine, to object to the introduction of the evidence, or to rebut the evidence. "The fair and impartial administration of justice demands that facts be determined only upon evidence properly presented on the record." *Price Bros.*, 649 F.2d at 419. Furthermore, because there is no record of the view, the litigants may effectively be denied any means of challenge on appeal.

953 F.2d at 1191.

These same concerns have been expressed by the Tennessee Supreme Court in a case where a trial judge relied on personal extrajudicial observations in his ruling. In *Vaughn v. Shelby Williams of Tennessee, Inc.,* 813 S.W.2d 132 (Tenn. 1991), our Supreme Court reversed a workers' compensation award because the trial judge based his disability determination in part on pre-trial observations he made of the plaintiff at a mall and in the courthouse parking lot. The Supreme Court ruled that "a judge is not permitted to make an investigation of a case, even an inadvertent one, off of the record, and then base a holding on the information obtained incident thereto." *Id*. at 134. The court reasoned that reliance on such an investigation was objectionable because,

> . . . by observing a party outside of the judicial proceedings, and then basing a decision on those observations, the judge becomes a source of evidence, in effect, a witness. Rule 605 of the Tennessee Rules of Evidence clearly prohibits a judge presiding over a trial from serving as a witness, and for good reason. Perhaps the most obvious one is that the system of justice does not appear to be impartial if the judge charged with the duty of adjudicating the litigation also acts as a source of evidence. Additionally, when the trial judge becomes a source of information, the parties may not be willing to cross-examine vigorously the judge whose goodwill is perceived to be important to the outcome of the case. Worse yet, the parties may not even get the opportunity to cross-examine the judge to begin with.

*Id*. at 133 (citations omitted).

The case before us does not involve personal observations of a judge outside of the litigation before him; it is clear in this case that the judge only went to inspect the property and the flooding to gain information to help him reach a decision in this case. However, that distinction does not eliminate all the problems created where a judge's personal observations are used as the evidence upon which the ruling rests. As the *Vaughn* Court observed,

> . . . when a judge becomes a source of evidence, appellate courts are put in an awkward position in that the character of the evidence obtained through private inquiry or observation, as well as its probative value, is not shown in the record, making an evaluation of the information on appeal difficult, if not impossible.

*Id*. at 133.[10]

The concerns expressed in these cases confirm our conclusion that the appropriate rule in Tennessee is that applied in a majority of other jurisdictions. We therefore hold that a trial judge has the inherent discretion to take a view of the site of a property dispute, a crime, an accident, or any other location, where such a view will enable the judge to assess the credibility of witnesses, to resolve conflicting evidence, or to obtain a clearer understanding of the issues. However, the view cannot be made to obtain additional evidence or to replace the requirement that evidence be produced at trial with the judge's personal observations of the site. Thus, the proper purpose of a view is to enable the judge to better understand the evidence that has been presented in court, not as a substitute for such evidence. Any determination of factual issues in a case where a judge has taken an on-site view must be supported by significant and material evidence in the record. Appellate courts will review such evidence appearing in the record under Tenn. R. App. P. 13, and where the evidence independent of the judge's personal observations preponderates against the finding, it is subject to being reversed on appeal.

Applying those principles to the case before us, it is clear that the judgment of the trial court must be reversed. The trial court's finding that the bridge or crossover caused the property to flood is unsupported by any evidence in the record other than Mr. Tarpley's one conclusory statement, and his cross-examination was cut short. The record gives us no basis to conclude that Mr. Tarpley was qualified to assess causation or the reasons why he reached that conclusion. It also provides no evidence regarding the situation before the construction or other factors that relate to causation. After the trial court's inspection, the parties were not given the opportunity to present evidence as to causation.

Instead, the trial court reached its own conclusion after simply viewing one instance of flooding. We are given no insight into the trial court's reasoning in this regard other than the judgment wherein the trial court found that after its inspection, "it appeared to the court that the bridge did in fact back up the waters and caused the . . . property to flood."[11] Even if we were to consider the trial court's observations as evidence, the only issue it could have proved was that the land in question was flooded on the day of the visit. That flooding could not be used as a basis for an inference that the property flooded at other times. It certainly provided no basis for a conclusion as to causation. *See Champion Dyeing & Finishing Co., Inc. v. Centennial Insurance Co.*, 810 A.2d

---

[10]We note that in the case before us, the judge's personal observations were the only evidence he relied on, while in *Vaughn*, the trial court's decision was based only in part on his personal observations of the plaintiff prior to trial.

[11]The Tarpleys' statement of the evidence includes parts of the judge's comments in the three-way conference with the parties' attorneys. It attributes to the judge statements that "he saw the creek backed up by the obstruction and saw that as a result of the same, the Plaintiffs' fields were being flooded." Obvious issues of judge as witness are raised by this procedure.

68, 75-76 (N.J. Super. 2002) (holding that trial court could not use site visit to decide that a party ignored the need for insurance as it had ignored its housekeeping responsibilities and that the court impermissibly relied on matters outside the record and "on inferences that lacked any basis whatsoever").

Because a view cannot supply new or independent evidence, there is no evidence in the record to support the trial court's decision. We are particularly troubled by the trial court's determination of causation without any competent evidence, relying instead only on his own observations and expertise, neither of which appears in the record. The parties were unable to question those observations, that expertise, or the source of that expertise, and this court is unable to review them or the soundness of the conclusions reached. The procedure used herein implicates the fundamental principles governing trials that (1) the case is to be decided only on the basis of evidence presented in court and subjected to appropriate rules and to cross-examination, and (2) that a judge cannot preside over a trial and be a witness in it.

## IV. The Question of Waiver

The Tarpleys argue that any objections that the Hornyaks might have had to irregularities in the trial court's actions were waived by their acquiescence to those actions. The Hornyaks' current attorney concedes on appeal that their former attorney did not raise an objection to the trial judge's announcement that he would be going out to the site to personally investigate the flooding. Nor did the attorney object to the judge and the opposing party making their site visit on a day when neither he nor his clients could be present.

Rule 36(a) of the Rules of Appellate Procedure sets out the nature of the relief the appellate courts of this state are authorized to grant, and states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." The Tarpleys accordingly argue that even if we regard the trial court's actions as erroneous, we are not obligated to reverse for the benefit of parties who took no steps to prevent the trial court from falling into error in the first place. We agree with this general principle, but we do not believe the Hornyaks waived all their objections.

It is clear that the parties had notice of the judge's intent to view the property and the opportunity to attend. These circumstances remove a direct challenge to the view itself as improper.[12] In addition, the Hornyaks through counsel waived any objection to the trial court's visit

---

[12] We note that a view taken without notice to the parties, the opportunity to be present, or the opportunity to have a court reporter present would seriously jeopardize any ruling where the view was considered and would raise issues regarding procedural safeguards necessary to any court proceeding. *See American Family Mut. Ins.*, 356 N.W.2d at 180 (holding that when a view is considered appropriate procedural safeguards should be employed so that accuracy and reliability are not sacrificed.) Without notice, the view becomes an extrajudicial investigation or off-the-record fact gathering by the judge.

to the location. That waiver, however, cannot be interpreted as an agreement that the trial court make its decision solely on the basis of his personal observations at the view. *See Champion Dyeing*, 810 A.2d at 75-76 (holding that a party's consent to the inspection by the judge was not an agreement to have issues decided on the basis of that inspection).

The Hornyaks argue that they were deprived of the opportunity to defend the lawsuit against them because, among other things, they were not allowed to put on proof about the flooding or the construction. We agree that evidence relevant to the case would include the occurrence or frequency of flooding before and after the construction at issue, the pre-existing structures, the construction or modifications performed by the Hornyaks on those structures, and the actual cause of the flooding. The Hornyaks claim that they were denied due process by the trial court's actions in denying the opportunity to testify or put on proof.[13]

Due process requires that parties be given an opportunity to be heard. That is, they must be allowed to present their claims or defenses at a meaningful time and in a meaningful manner. *Baggett v. Baggett*, 541 S.W.2d 407 (Tenn. 1976); *Case v. Shelby County Civil Service Merit Bd.*, 98 S.W.3d 167, 172 (Tenn. Ct. App. 2002); *State v. AAA Aaron's Action Agency Bail Bonds, Inc.,* 993 S.W.2d 81, 85 (Tenn. Crim. App. 1998).

A waiver is a voluntary relinquishment or renunciation of some right. *Baird v. Fidelity-Phoenix Fire Ins. Co.*, 178 Tenn. 653, 162 S.W.2d 384 (1942). A waiver of a legal right must be evidenced by a clear, unequivocal and decisive act of the party showing such a purpose. *Stovall of Chattanooga, Inc. v. Cunningham*, 890 S.W.2d 442 (Tenn. Ct. App. 1994). For the waiver of a fundamental constitutional right to be effective, the record must contain evidence of an intentional relinquishment of a known right. *Team Design v. Gottlieb*, 104 S.W.3d 512, 528 (Tenn. Ct. App. 2002). Based upon the record before us, we cannot conclude that the Hornyaks waived their right to defend the lawsuit against them by presenting evidence. In addition, we have already determined that the trial court's use of its personal observations as the sole basis for its judgment requires reversal.

The other issue raised by the Hornyaks, *i.e.*, that the trial court engaged in *ex parte* communications with Mr. Tarpley and his counsel during the visit to the property is pretermitted by our resolution of the appeal on the basis of the trial court's reliance on the view for its decision. However, we note that conducting the view on the record, at least insofar as any communication to the court is concerned, would have eliminated this issue and any concern by the parties as to the substance of those communications.

---

[13]The Tarpleys argue that the Hornyaks waived any rights to put on additional proof. They claim that during the conference in chambers the judge said that he would be happy for the parties to put on all the proof they wanted to, but that the appellants declined to take him up on his offer. It appears to us, however, that the Tarpleys' own Statement of the Evidence as well as the order entered by the court support an inference that the trial judge was determined to view the situation on the ground for himself. After the site visit, the judge simply announced his decision, without giving either party a prior opportunity to present any evidence or argument that might have led him to reach a different conclusion.

## V. Conclusion

The judgment of the trial court is reversed, and this case is remanded to the Chancery Court of Wilson County for further proceedings consistent with this opinion.  Tax the costs on appeal to the appellees, Ernest and Mary Nell Tarpley.

_____
PATRICIA J. COTTRELL, JUDGE