IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 18, 2018 Session

## NATIONAL PARKS RESORT LODGE CORPORATION v. ANTONIO PERFETTO, ET AL.

Appeal from the Chancery Court for Sevier County
No. 03-3-138     Robert E. Lee Davies, Senior Judge

---

### No. E2017-01330-COA-R3-CV

---

This appeal arises from a judicial determination of the fair value of dissenters' shares in a corporation. In 2002, King Solomon's Palace, Inc., ("KSP") a corporation created in 1986 for the purpose of establishing a hotel in Pigeon Forge, announced its pending merger into another company, National Parks Resort Lodge Corporation ("Plaintiff"). Johnny Jess Davis ("Davis") was the majority shareholder of KSP. Dissenters Antonio Perfetto and David L. Donohue ("Defendants") each held 50 shares of KSP common stock. Plaintiff filed a complaint in the Chancery Court for Sevier County ("the Trial Court") seeking a judicial determination of the fair value of Defendants' shares. After a trial, the Trial Court awarded Defendants $186,913 for their shares and $122,876 in attorney's fees and costs. The Trial Court found, in part, that Davis had manipulated and withheld financial information to Defendants' detriment. Plaintiff appeals to this Court, arguing, among other things, that the evidence preponderates against the Trial Court's findings regarding Davis's conduct. Defendants raise an additional issue arguing that the Trial Court set the value of their shares lower than it should have under the evidence. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and JOHN W. MCCLARTY, JJ., joined.

Lewis S. Howard, Jr. and Erin J. Wallen, Knoxville, Tennessee, for the appellant, National Parks Resort Lodge Corporation.

D. Scott Hurley and Ryan N. Shamblin, Knoxville, Tennessee, for the appellees, Antonio Perfetto and David L. Donohue.

## OPINION

## Background

In 1986, Davis and Ed Neely formed KSP for the purpose of developing a hotel in Pigeon Forge, Tennessee. Davis later acquired Neely's stock interest in KSP. Davis contracted with Rouse Construction Company to build the hotel. Defendants were owners and officers of Rouse Construction. KSP could not afford the nearly 5 million dollar price for building the hotel. Instead, in exchange for their foregoing the final $350,000 on construction costs, Defendants each accepted 50 shares of KSP common stock. There were 2,000 outstanding shares overall. Davis owned 90% of the shares, Defendants owned 5% together, and the partnership of Snowden and Wallace owned another 5%.

From 1987 through the merger that precipitated this lawsuit in 2003, Defendants were shareholders in KSP. Defendants never received any income from their KSP stock. Snowden and Wallace's shares later were bought and converted to treasury stock, the result being Defendants then held 5.26% of KSP's outstanding shares. From the year 1993 through 2002, KSP's annual sales ranged from a low of $2,422,008 in 1997 to a high of $2,715,493 in 2002. In November 1996, Davis signed a Personal Financial Statement representing KSP was worth $11,600,000.

In the '90s, Davis undertook various transactions that became a point of controversy in this case. Perhaps the most contentious is that of Davis's unpaid salary, or management fee, and his level of transparency in the amount he claimed he was owed. Davis wrote off more than 2 million dollars in KSP assets. Davis engaged in transactions with other entities he owned or held controlling interest to effectuate large write-offs of receivables. Meanwhile, a 1997 Woodford and Associates appraisal of the hotel reflected its worth as $11,500,000. In 2002, despite no obvious intervening factors other than the passage of several years, an appraisal by Woodford and Associates reflected the lesser value of $7,250,000.

In November 2002, KSP gave notice that it would vote upon a merger with Plaintiff. At a December 2002 shareholder meeting, Defendants voted against the merger. Defendants did not, however, provide written notice of dissent as required by Tenn. Code Ann. § 48-23-202. In January 2003, Plaintiff sent Defendants a check for $11,600 for their KSP shares. Defendants objected to this amount. In March 2003, Plaintiff filed suit against Defendants in the Trial Court seeking a judicial determination of the value of their shares. The case subsequently plodded on for over a decade before finally being tried without a jury on November 29, 30, and December 1, 2016.

In March 2017, the Trial Court entered its detailed amended memorandum and order wherein it placed a value on Defendants' shares, stating as follows in pertinent part:

In 1997, Davis implemented a series of financial transactions between KSP and these other entities in which he owned a complete or controlling interest. The overall impact of the related party transactions resulted in large write-offs of value or new liabilities for KSP. In addition to the unpaid salary claim, Davis caused KSP to loan sums to his other entities which he later wrote off as expenses or caused KSP to become indebted to pay for expenses incurred by these entities which he owned, totaling approximately $2.5 million dollars. Neither the unpaid salary claim nor the related party transactions were recorded as having been approved by KSP in any minutes of any board of directors meeting. The bylaws of KSP provide that no loans will be contracted on behalf of the corporation and no evidence of indebtedness shall be issued in its name unless authorized by a resolution of the board of directors. While the bylaws allow the board of directors to meet without having a formal meeting, they still require written consent and provide that these resolutions must be included in the minutes.

In the fall of 1997, Perfetto and Donohue asked Davis if he objected to the transfer of their stock to Rouse Construction. Davis agreed, but when Mr. Ingram [Davis's CPA] was informed, he told Davis this would cause KSP tax issues. In September 1997 Perfetto and Donohue transferred their fifty shares of KSP to Rouse Construction. On February 25, 1998, KSP filed suit in Knox County Chancery Court and obtained an injunction setting aside the Defendants' transfer of their KSP stock to Rouse. As part of the injunction lawsuit, Defendants requested additional financial records of KSP, and KSP provided Defendants with the 1996 financial statement; however, KSP did not provide the 1997 year-end financial statement within a year, Defendants requested to have their shares of KSP purchased for $600,000. As a result, in 2001, Davis decided to eliminate the Defendants by use of a merger. He spoke to his CPA who advised Davis that he would need a business appraisal and a real estate appraisal. Davis then contacted Woodford and Associates to perform the real estate appraisal for the express purpose of negotiating the buyout of the minority shareholders' interest. Woodford's appraisal was completed August 12, 2002. In that appraisal, Woodford valued the land at $3,350,000, the improvements at $3,650,000, and furnishings, fixtures and equipment at $250,000 for a total of $7,250,000. Five years earlier, Woodford had appraised the same property for Davis when Davis was in the process of obtaining a loan from the bank. The 1997 Woodford appraisal valued the land at $3,250,000, the

-3-

improvements at $7,500,000 and the furnishings, fixtures and equipment at $750,000 for a total of $11,500,000. Davis' own financial statement of November 10, 1996 (Exhibit 48), indicates the total value of KSP stock (including the hotel and 3.5 acres) to be $11,600,000.

On October 17, 2002, KSP advised Defendants by letter that it anticipated a merger of KSP into another company (National Parks Resort Lodge, Corp.). Since May 2002, Defendants (through their attorney) had made multiple requests for access to financial statements of KSP (specifically the 1997 financial statement); however, this financial information was not produced. During the same time, KSP had received a business evaluation prepared by Renee Harwell of Coulter and Justus, P.C. Harwell had evaluated one hundred shares of KSP stock as of August 31, 2002 with an appraisal dated October 7, 2002. By letter dated November 25, 2002, KSP provided Defendants with written notice of a special meeting of the shareholders of KSP to be held on December 12, 2002 for the purpose of considering and voting upon the merger of KSP into National Parks Resort. Although the Defendants did not provide written notice to KSP of any intent to demand payment for their shares if the proposed merger went through, Davi[s] knew that both Defendants had repeatedly demanded that their shares be purchased.

***

Renee Harwell testified on behalf of the Plaintiff. Harwell worked for Coulter and Justus from 1999 to 2014. She has been a certified public accountant since 1989. Davis provided Harwell with the information which she requested. Harwell used the Delaware Block method for her business appraisal of KSP. Under that method the appraiser includes the asset approach, the income approach, and the market approach. Although the Delaware Block Method recommends the use of five years of financial statements, Harwell, in her preliminary appraisal used four years and seven months. As a result, she did not use and was not provided the 1997 year-end financial statement. However, she agreed the appraiser should attempt to identify any extraordinary, non-reoccurring transactions that have nothing to do with the business and then exclude those transactions from the appraisal. Since she was not provided the 1997 financial statement, she did not consider the $750,000 of cancellation of debt from Davis to KSP. She also did not consider the $1,028,856 of charge offs of accounts receivables. Although she was provided with the 1997 Woodford appraisal of $11,500,000, she elected not to consider it; nor did she consider the sale of the Snowden and Wallace stock with an agreed value of $250,000.

-4-

Harwell's final appraisal was completed in March 2007. Due to the issue of the unpaid salary or management fees, Harwell came up with three scenarios. In the first scenario there is no cash flow. Under scenario two, the management fee is reduced to the industry average of three percent (3%) plus an additional two percent (2%) for owner compensation. The final scenario three is the average of scenario one and two. Harwell assigned a twenty-five percent (25%) weight to the asset approach, twenty-five percent (25%) weight to the market approach, and fifty percent (50%) weight to the income approach. Her indicated fair value of the equity of one hundred shares (representing a 5.26% interest) ranged from $31,800 (Scenario one) to $62,900 (Scenario two).

Both Defendants testified. Donohue basically went along with and relied upon Perfetto. Neither Perfetto nor Donohue realized that Davis was planning to cancel the debt owed by his related companies to KSP or to reach back and recover over a million dollars with prior period adjustments for his unpaid salary. Although both Defendants testified they were told by both Davis and his attorney that there was nothing in the original shareholders' agreement (between Davis and Neely) that concerned them, those representations are of no avail. Likewise, in 1992, Davis asked Perfetto to guarantee additional debt with First National Bank. As an inducement, Davis represented he would limit his management fee to no more than $85,000 a year. Although a draft document was prepared to this effect, it was never signed; however, Perfetto did guarantee the debt. The Court finds the testimony of Perfetto and Donohue, although limited, to be credible.

Defendants hired Leroy Bible as their expert. Bible is a certified public accountant and a certified fraud examiner. He has testified many times for plaintiffs and defendants and as a court appointed expert. The items considered by Bible are set forth in Exhibit 58. Bible prepared a detailed critique of the Coulter and Justus business appraisal. The purpose of Bible's report was to determine if the Coulter and Justus report was in fact a fair offer to the Defendants. Bible agreed with the Delaware Block Method used by Coulter and Justus; however, he had four issues with the report:

1. He was concerned with the adjustment made to retained earnings which was greater than forty percent (40%) of the total revenue;
2. The failure to consider the addition of the right-of-way;
3. Hiding the 1997 financial statement from Coulter and Justus; and
4. The treatment of the interrelated party transactions.

Bible's report of October 31, 2006, did not include the adjustments and numbers from the final report issued in March 2007 by Coulter and Justus.

However, using the preliminary report, Bible concluded that the true value for 5.26% of stock ranged from $646,727 to $738,306.[1]

## ANALYSIS

Tenn. Code. Ann. § 48-23-101 *et seq.* provides a procedure for shareholders to dissent from the share value determined upon a plan of merger. Since the parties were unable to reach an agreement on the demands of the dissenters, Perfetto and Donohue, the parties are required to undertake a judicial proceeding to determine the fair value of those shares.

### The Waiver Issue

Although Plaintiff did not plead a waiver occurred, at trial Plaintiff contended Defendants had waived their right to have their shares valued since they failed to send a written notice of their intent to demand payment before the vote was taken. Tenn. Code Ann. § 48-23-202(b). While it is true, Defendants did not provide written notice to the corporation, the Court finds Plaintiff waived the requirement under the statute. Prior to the notice of the special meeting of the shareholders of November 25, 2002, Davis was well aware of the Defendants' repeated requests to purchase their stock. The agenda for the shareholders' meeting on December 12, 2002, specifically acknowledged that "the minority shareholders have previously expressed a desire to have their shares bought out and have gone so far as to try to force a buyout . . . and the minority shareholders have recently expressed an intent to force a buyout of their shares." All parties attended the special meeting on December 12, 2002, at which time Davis' attorney discussed the legal ramifications, and Davis elected to proceed with the shareholders' meeting where the Defendants were offered $11,600 for their one hundred shares. The minutes of said meeting clearly reflect that the minority shareholders intended to dissent to the $11,600 value. The merger was approved, the Defendants tendered their stock, and Plaintiff tendered a check for $11,600. A waiver is a voluntary relinquishment of a known right. Chattem, Inc. v. Provident Life and Acc. Ins. Co. 676 S.W.2d 953, 955 (Tenn. 1984); Tarpley v. Homyak, 174 S.W.3d 736, 751 (Tenn. Ct. App. 2004). Waiver may be proved by acts and declarations manifesting an intent and purpose not to claim the supposed advantage or by a course of

---

[1] .26% was added to the Defendants' share due to the placement of Snowden and Wallace's 100 shares as treasury stock. Bible's actual number for 5% was $520,909 to $738,306. Bible also assigned different weight to the three approaches. He assigned forty percent (40%) to the asset approach, forty percent (40%) to the market approach, and twenty percent (20%) to the income approach.

acts in conduct, by so neglecting and failing to act, as to induce a belief that it was the party's intention and purpose to waive. Jenkins Subway, Inc. v. Jones, 990 S.W.2d 713, 772 (Tenn. Ct. App. 1998). Plaintiff proceeded with the meeting, voted on the merger, accepted Defendants' stock, and tendered Defendants payment for the stock. This issue is without merit.

## Determination of Fair Value

Tenn. Code Ann. § 48-23-101(4) provides that fair value with respect to a dissenter's shares is the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action. Tennessee uses the Delaware Block method to determine fair value for dissenters. Blasingame v. American Materials, Inc., 654 S.W.2d 659 (Tenn. 1983). Under Delaware Block, the corporation is analyzed based upon market value, asset value, and earnings value.

Market value approach: "The market value method establishes the value of the share on the basis of the price for which a share is selling or could be sold to a willing buyer. This method is most reliable when there is an established market for the stock." Blasingame at 666. Where there is no reliable market because the stocks were not traded, there is no or sporadic trading history "market price is not considered at all." Genesco, Inc. v. Scolaro, 871 S.W.2d 487 (Tenn. Ct. App. 1993).

Asset value approach: "The asset value method looks to the net assets of the corporation valued as a 'going concern', each share having a pro rata value of the net assets. The net assets value depends on the real worth of the assets determined by physical appraisals, accurate inventories, and realistic allowances for depreciation and obsolescence." Blasingame at 666. The asset approach is weighed more heavily when the company holds assets for appreciation purposes rather than for commercial, retail or wholesale purposes designed to generate earnings. Blasingame at 666.

Earnings value approach: "The investment method relates to the earning capacity of the corporation and involves an attempt to predict its future income based primarily on its previous earnings records. Dividends paid by the corporation are considered its investment [earnings] value." Blasingame at 666.

-7-

The values reached by these three approaches are then weighted to customize the valuation to the particular circumstances of the corporation. Next, the value found by each of the three methods is multiplied by the weighted factor expressed as a percentage of the whole so that the products of the three calculations when added together will equal one hundred percent (100%). Elk Yarn Mills v. 514 Shares of Common Stock of Elk Yarn Mills, Inc., 742 S.W.2d 638, 640 (Tenn. Ct. App. 1987).

The unique facts and circumstances of a company determine whether values are assigned under each of these three approaches and the amount of that value. The weight to be given to the particular values takes into consideration the type of business, the objectives of the corporation and other relevant factors. Blasingame at 666. Thus, in applying the Delaware Block formula, Tennessee Courts take into account the individual circumstances of the company being valued. Accordingly, the court considers the impact of the unique facts and circumstances of the Company to make those findings and determine the true value of the stock. Athlon Sports Communications, Inc. v. Duggan, 2016 W.L. 6087667 (Tenn. Ct. App. 2016).

In this case the experts who testified for each side had some fundamental disagreements regarding the true value of this corporation. Although the Court does not agree with all of the conclusions reached by either expert, the Court tends to agree more with the approach of Mr. Bible. Initially, the Court notes that the particular facts of this case should have required the use of ten years of financial information. The revenues from 1993 through 2002 were fairly consistent, ranging from a low in 1997 of $2,422,008 to a high of $2,715,493 in 2002.

It is troublesome to the Court that although Harwell requested five years of financial information, Davis only provided four years and seven months. This was structured to keep Coulter and Justus from considering the 1997 financial statement. If the 1997 statement had been included, Coulter and Justus would have considered the $750,000 cancellation of debt which Davis owed KSP. The 1997 financial statement showed a $512,303 loss for the year. The unpaid salary of Davis was never carried as an expense in the audited financial statements of the company. This was an intentional decision by Davis to keep Charter Federal from calling his loan. KSP had its financial statements audited from 1993 through 1997. The accounting firms which performed these audits follow certain professional standards. Included in these standards is the fact that all significant business expenses are to be recorded in the time period in which they are incurred. Omitting the unpaid Davis salary disclosures from audited financial statements suggests that Davis never expected to be paid these

amounts. In support of this conclusion, the Court notes that Davis still has not received any of his unpaid salary fee from National Parks Resort. It is troubling to the Court that Davis would represent one position to his lender and then later when it suited his purposes take a completely different position with the minority shareholders. Likewise, in 1998, $1,028,856 in account receivables of KSP owed by Davis related entities were charged off. This amount should have been added back to the KSP financial statement either by calling it a dividend or placing it back as an asset of the company.

Audits were not performed for the years 1998 through 2001. The accounting reports and compiled statements omitted cash flow statements. There has been inconsistent treatment of the unpaid salary claimed by Davis. It was not considered by Coulter and Justus in determining the market value or asset value, but it was considered in determining the investment value in future earnings calculations. The Court agrees with Mr. Bible that the uncompensated salary claimed by Davis cannot be valid for one of the methods of determining value and invalid for the other two approaches under the Delaware Block method. The use of the unpaid salary claimed by Davis in the income approach only by Coulter and Justus lead to a negative value for the company. This greatly distorts the value of KSP. Both experts agreed that the standard management fee for this type of entity was three percent (3%). Coulter and Justus added another two percent (2%) for an owner, but that amount is still vastly different from the amounts claimed by Davis pursuant to his original shareholder agreement with Neely.

The Court also agrees with Mr. Bible that the better analysis under the asset approach should have included the other appraisals and Davis' own financial statement concerning the value of KSP. In her analysis, Harwell only considered the August 2002 Woodford appraisal, which was commissioned by Davis for the express purpose of negotiating this buyout. Five years earlier, this same appraiser valued the total property at $11,500,000 for the purpose of Davis obtaining a loan with the bank. Although the 2002 Woodford appraisal indicated the improvements were structurally in good physical condition, the appraisal indicated the value of the improvements had decreased by $3,850,000 while the value of the land only had increased by $100,000 over the five year period. The result in comparing the two appraisals by the same appraiser was that over this five year period (1997 to 2002), the total value of the hotel had decreased by $4,250,000. In addition, Harwell failed to consider Davis himself had provided a personal financial statement dated November 10, 1996 in which he listed the total value of KSP at $11,600,000. Apparently, no one at

Coulter and Justus requested an explanation for the significant difference in these appraisals. The Court has serious concerns about the validity of the 2002 Woodford appraisal and gives it little weight.

Another concern of Bible was the failure of Coulter and Justus to consider the addition of the right-of-way which provided another point of access to the hotel. Although Harwell agreed she did not separately consider the right-of-way, her reason for not doing so was that this value was included in the 2002 Woodford appraisal, and that to consider it would in effect be "double dipping". While the Court agrees with Harwell that the 2002 Woodford appraisal does consider the right-of-way, the Court has already indicated its concerns regarding the values articulated in this report.

At the time Davis bought out the shares of Snowden and Wallace, he obtained a loan from the bank and commissioned an appraisal by Scott Collins for the purpose of purchasing the right-of-way and buying out his partners. Coulter and Justus only capitalized $120,000 for the right-of-way when the total cost was actually $870,000. This had a significant effect on the value of KSP in 1997 when it showed a loss of $512,303. Both the total value of the right-of-way and the $1,028,856 of account receivables should have been considered in the assets approach. While the $750,000 cancellation of debt from Davis to KSP did not affect the assets, it did affect the income approach.

With regard to the market approach, the Court notes that none of the comparable sales used by Coulter and Justus included a Tennessee hotel. Some of the comparative sales also included very unusual sales, and the comparable sales in the final report were completely different than the comparable sales in the preliminary report. Harwell described what she referred to as "sanity checks" that a business appraiser will sometimes use to determine if their values are within an acceptable range. However, Harwell failed to consider the actual sale that took place in 1997 when Davis purchased the one hundred shares of Snowden and Wallace at an agreed upon value of $250,000 approved by the company's CPA, Joe Ingram. On the other hand, Harwell has a valid criticism of Bible's use of only the Snowden and Wallace transactions to establish the market approach value. Finally, Harwell deducted a six percent (6%) commission for the selling cost of KSP and a fifteen percent (15%) capital gains tax. The Court finds that transfer costs and taxes are not proper deductions when there is no evidence that a party intends to sell the asset, which did not happen in this case. Jekot v. Jekot, 232 S.W.3d 744, 749 (Tenn. Ct. App. 2007); Watson v. Watson, 2005 W.L. 1882413 at pg. 8 (Tenn. Ct. App. 2005).

Considering the full business appraisal by Coulter and Justus, and the critique of that appraisal by Leroy Bible, the Court makes the following calculations to determine the true value of the Defendants' one hundred shares:

**Conclusion of Fair Value of a 5.26% Interest**

Approaches: Invested Capital Value, Less Debt, Equity Value, Weight, Indication

Asset Approach $12,916,273, $5,714,055, $7,202,218, 33.33%, $2,400,499
Market Approach $7,991,998, $5,714,055, $2,277,943, 33.33%, $759,238
Income Approach with Adjusted Mgmt. fee
$6,895,451, $5,714,055, $1,181,396, 33.33%, $393,759

Fair Value of Equity $3,553,496.00
Fair Value of 100 shares (5.26% interest) **$186,913.00**

(Footnote in original but renumbered, emphasis added). The respective sides filed post-trial motions. In June 2017, the Trial Court entered its final order in which it disposed of these motions and also awarded Defendants' their attorney's fees, stating as follows, in relevant part:

Defendants have requested the Court to alter the percentages which the Court assigned to the three methods of valuation utilized by the Delaware Block Method. Defendants request the Court to assign a ten percent weight to the Earnings Approach and forty-five percent to the Asset and Market Approach pursuant to the calculations by Mr. Bible. On the other hand, Ms. Harwell assigned a much higher percentage to the Income Approach and lower percentages to the Asset and Market Approach. On this issue, the Court declined to accept either expert's opinion and has determined that the better approach is to assign equal values to each of the three approaches:
For the above reasons, Defendants' motion is not well taken and is therefore denied.

**Attorney's Fees**

Plaintiff questioned the award of attorney's fees in this case, arguing that the Court should compare the actions of each party. In essence, Plaintiff argues that the actions of the Defendants were just as vexatious as those of Plaintiff. Plaintiff also contends that the Court's focus should be limited to the actions by a party with respect to the merger, and that the Court not consider the conduct of a party prior to the notice of merger.

The Court agrees with Plaintiff, that the statute considers the conduct of party only with respect to the rights set forth in Tennessee Code Annotated § 48-23-101 et seq. The statute provides in part that:

> (b) The Court may also [assess] the fees and expenses of counsel and experts for the respective parties, in amounts the Court finds equitable against:
> (2) Either the corporation or a dissenter, in favor of any other party, if the Court finds that the party against whom the fees and expenses are [assessed] acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided by this chapter.

Tenn. Code Ann. § 48-23-[3]02.

Under this statute, once a plan of merger has been proposed, the dissenters are then entitled to assert their rights and demand payment for their shares if the proposed action is effectuated. Once that occurs, the statute places the burden on the corporation to produce financial records and appraisals so that a determination of the fair value of the corporation can be made. In this case, Mr. Davis acting as the controlling shareholder, embarked upon a scheme to dilute the value of the one hundred shares held by Mr. Donohue and Mr. Perfetto. He intentionally withheld the 1997 audited financial statement of KSP from Coulter and Justice. He ordered an appraisal from Mr. Woodford for the express purpose of buying out the Defendants' shares, but he intentionally withheld from Coulter and Justice the prior Woodford appraisal and his own personal financial statement which included the value of KSP at a much higher value. He insisted on including his claim for unpaid salary in the Coulter and Justice appraisal even though he had taken a completely different position with his lender and kept it off his audited financial statements. He refused to provide Defendants with the 1997 financial statement until he was ordered to do so by this Court. His formal offer at the merger in January 2002 was $11,600. While it is true Mr. Davis undertook the required action under the statute and hired reputable experts, he intentionally withheld information which

should have been included and manipulated information to the detriment of the dissenters. The Court finds that the award of attorney's fees and expenses against the corporation is justified in this case and awards $122,876 in fees and expenses pursuant to the affidavit of Scott Hurley. In making the above findings, the Court specifically notes that it is the conduct of Mr. Davis which the Court finds to be vexatious and not in good faith. His attorney, Lewis S. Howard, Jr. has conducted himself in an exemplary fashion and has represented his client zealously pursuant to the Code of Professional Conduct.

Plaintiff timely appealed to this Court.

## Discussion

Although not stated exactly as such, Plaintiff raises the following issues on appeal: 1) whether the Trial Court erred in finding that Plaintiff waived the requirement set forth in Tenn. Code Ann. § 48-23-202 that dissenting minority shareholders send written notice of their intent to demand payment in the event of a merger; 2) whether the Trial Court erred in rejecting the 2002 Woodford Appraisal in favor of less recent figures; and 3) whether the Trial Court erred in awarding Defendants their attorney's fees and costs. Defendants raise their own issue of whether the Trial Court erred in assigning equal value to the asset, market, and earnings approaches under the Delaware Block Method.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). A trial court's determinations regarding credibility are accorded deference by this Court. *Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

We first address whether the Trial Court erred in finding that Plaintiff waived the requirement set forth in Tenn. Code Ann. § 48-23-202 that dissenting minority shareholders send written notice of their intent to demand payment in the event of a merger. Defendants acknowledge that they failed, at least pursuant to the statute, to provide written notice of their dissent. However, they emphasize that there were extensive exchanges ahead of the merger reflecting their intent to dissent, and that the fact of their dissent was well-established and of no surprise to Plaintiff. Moreover,

-13-

Defendants point out correctly that Plaintiff's own complaint initiating this lawsuit requested a judicial determination of the fair value of the dissenters' shares which is exactly what the Trial Court did. As found by the Trial Court, "Plaintiff proceeded with the meeting, voted on the merger, accepted Defendants' stock, and tendered Defendants payment for the stock." The Trial Court found also that "Davis was well aware of the Defendants' repeated requests to purchase their stock," findings which the evidence does not preponderate against.

Defendants failed to adhere to the letter of the statute requiring them to provide written notice of dissent. However, it is clear from the record that Plaintiff knew of Defendants' intention to dissent and, indeed, Plaintiff proceeded exactly as though Defendants had complied with the statute and even filed suit requesting a judicial determination of the fair value of Defendants' shares. Plaintiff suffered absolutely no prejudice as a result of Defendants' failure to provide written notice. The Trial Court did what Plaintiff asked the Trial Court to do which was determine the fair value of Defendants' shares. Given all this, we agree with the Trial Court that Plaintiff waived the requirement of written notice of dissent set forth in Tenn. Code Ann. § 48-23-202.

We next address whether the Trial Court erred in rejecting the 2002 Woodford Appraisal in favor of less recent figures. Tennessee courts have used the Delaware Block Method for some time in determining fair value for dissenting shareholders. *Blasingame v. American Materials, Inc.*, 654 S.W.2d 659, 667 (Tenn. 1983), *superseded by statute on other grounds.*[2] This Court has described succinctly the Delaware Block Method as follows:

> The Delaware Rule, or Delaware Block Method, utilizes the three primary methods used by courts in determining the fair value of shares of dissenting shareholders-the market value method, the asset value method and the investment value method-and then assigns weight to each method as may be appropriate considering the type of business, the objectives of the corporation, and other relevant factors. For example, where there is no established market and none can be reconstructed, market price is not considered at all; or in a commercial business, earnings are given great weight as the primary purpose of the business is to generate earnings and not to hold assets that will appreciate in value. *See Blasingame*, 654 S.W.2d at 667.

---

[2] In the case of *Athlon Sports Communications, Inc. v. Duggan*, No. M2015-02222-COA-R3-CV, 2016 WL 6087667 (Tenn. Ct. App. Oct. 17, 2016), this Court recognized the continuing use of the Delaware Block Method consistent with *Blasingame*. Our Supreme Court granted Rule 11 permission to appeal in that case and has not yet issued its opinion.

*Hubbell v. Sumner Anesthesia Associates, Inc.*, No. M2008-01736-COA-R3-CV, 2009 WL 1162650, at *4 n. 3 (Tenn. Ct. App. Apr. 29, 2009), *no appl. perm. appeal filed*. "There are numerous other factors that expert witnesses may deem relevant on the question of the weight to be given each of the three methods, but the courts must make the final determination of the appropriate weight to be given each method as well as the ultimate value of the stock interest." *Blasingame*, 654 S.W.2d at 667.

Plaintiff argues on appeal that the Trial Court erred in finding that the 1997 appraisal, sought for the purpose of obtaining a loan, was more credible than the appraisal conducted in 2002, the purpose of which was defined in part as assisting in negotiations concerning a sale of the property. According to Plaintiff, "The reasonable inference is that each such appraisal would reflect the highest estimated value based upon the facts in existence at the time of the appraisal, and the record is void of any evidence to the contrary." However, this is not correct. We first note that the evidence does not preponderate against any of the findings of fact made by the Trial Court. The Trial Court cited numerous factual bases for its discounting the 2002 appraisal. First, the Trial Court found that the 2002 Woodford Appraisal was "commissioned by Davis for the express purpose of negotiating this buyout." The stated purpose in the appraisal is: "[T]o furnish an estimate of the value of the fee simple estate interest in the property. This report is intended for use only by the client, Jess Davis, to assist in negotiations concerning the sale of the property. Use of this report by others is not intended by the appraiser." While the Trial Court's language was not identical to that found in the appraisal itself, its characterization of that appraisal's purpose was apt. Continuing its findings, the Trial Court stated: "Although the 2002 Woodford appraisal indicated the improvements were structurally in good physical condition, the appraisal indicated the value of the improvements had decreased by $3,850,000 while the value of the land only had increased by $100,000 over the five year period. The result in comparing the two appraisals by the same appraiser was that over this five year period (1997 to 2002), the total value of the hotel had decreased by $4,250,000." The Trial Court went on to note that "Harwell failed to consider Davis himself had provided a personal financial statement dated November 10, 1996 in which he listed the total value of KSP at $11,600,000." Finally, the Trial Court found: "The Court has serious concerns about the validity of the 2002 Woodford appraisal and gives it little weight."

Contrary to Plaintiff's arguments, the Trial Court was not bound to accept uncritically the 2002 Woodford Appraisal merely because it was more recent. The Trial Court examined the surrounding circumstances, including the timing and purpose of the appraisal, as well as other valuations tending to reflect a different value. The Trial Court made its findings relative to these appraisals, and the evidence does not preponderate against those findings.

Plaintiff argues that the Trial Court was required to determine the fair value of the dissenters' shares as of immediately before the merger and not at some earlier date, which is a correct proposition. However, Tennessee law nowhere requires that the court must accept the most recent appraisal's conclusion regardless of other attendant circumstances. We find no error by the Trial Court in its ascribing little weight to the 2002 Woodford Appraisal.

We next address whether the Trial Court erred in awarding Defendants their attorney's fees and costs. In *Genesco, Inc. v. Scolaro*, 871 S.W.2d 487, 491 (Tenn. Ct. App. 1993), this Court discussed as follows a scenario wherein a shareholder was awarded attorney's fees and expenses on the basis of the corporation's bad conduct:

> The special master in the present case found as a fact that Genesco did not consult an established appraiser, relying instead on its own investment banker to update previous opinions it had furnished for exchange offers; that neither Genesco nor its investment banker considered the Delaware Block method or made a reasonable judgment that it was inappropriate and inferior to the Discounted Cash Flow method employed by Genesco; that Genesco and its investment banker destroyed some of the information underlying their cash flow assumptions which was necessary to test the validity and accuracy of their calculations; that Genesco never raised its initial offer even after the chancellor granted summary judgment to Mr. Landis on the correct method to use in appraising the shares; that Genesco was less than forthcoming in providing information and consistently resisted the request for discovery and sought the court's protective orders, resulting in an unduly protracted, expensive, and acrimonious dispute.

> We think the findings of the special master are supported by the evidence and that the special master and the chancellor were justified in finding that Genesco's conduct was arbitrary, vexatious, and in bad faith.

In the present case, the Trial Court found that "[w]hile it is true Mr. Davis undertook the required action under the statute and hired reputable experts, he intentionally withheld information which should have been included and manipulated information to the detriment of the dissenters." Plaintiff argues in opposition that, as opposed to the scenario in *Genesco*, Plaintiff consulted an established appraiser who applied the Delaware Block Method; offered Defendants a higher amount than initially offered; and never destroyed any of the information needed to test the validity of the calculations performed by Coulter & Justus. Distinctions from *Genesco* notwithstanding, the evidence in the record on appeal does not preponderate against the Trial Court's

findings cited above relative to those acts by Davis it deemed vexatious. For example, Davis refused to grant Defendants' access to the 1997 financial statements until he was compelled to do so by court order. Plaintiff argues that an "intellectual dispute" among lawyers was to blame for failure to produce the 1997 records. The Trial Court, understandably, was not moved by this explanation, and neither are we. Much time has passed and many resources expended in the pendency of this long-running case. Davis's slow-dragging, while not necessarily the only cause of the delay, certainly has not assisted in resolving this matter. We affirm the judgment of the Trial Court in its award of $122,876 in attorney's fees and costs to Defendants.

The final issue we address is Defendant's sole issue of whether the Trial Court erred in assigning equal value to the asset, market, and earnings approaches under the Delaware Block Method. Defendants assert that, because of Davis's manipulation of earnings, the earnings approach should constitute only 10% in the Delaware Block analysis in this case. Defendants would assign equal 45% weight to the asset and market approaches. Under these proportions, Defendants request an award of $230,609.55.

While Defendants' argument has a certain logic to it, we are disinclined to tweak or second-guess the Trial Court's valuation when it chose a figure within the range of evidence presented at trial after listening to the experts and crafting a detailed and well-supported basis for its decision based upon its findings which we have upheld. The Trial Court made a reasoned determination of the weight to be given to the three methods, and we decline to tinker with the Trial Court's assignment of weight to the Delaware Block categories. We affirm the judgment of the Trial Court in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, National Parks Resort Lodge Corporation, and its surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE